## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON

JAMES TIMOTHY SAMPLES,

      Petitioner,

v.                                                    Case No. 2:14-cv-15413

DAVID BALLARD, Warden,
Mount Olive Correctional Complex,

      Respondent.

### PROPOSED FINDINGS AND RECOMMENDATION

On April 28, 2014, James Timothy Samples (hereinafter "the petitioner") filed a Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254 (ECF No. 2).  This matter is assigned to the Honorable Thomas E. Johnston, United States District Judge, and it is referred to the undersigned United States Magistrate Judge for submission of proposed findings and a recommendation for disposition, pursuant to 28 U.S.C. § 636(b)(1)(B). Pending before the court are the respondent's Motion for Summary Judgment (ECF No. 10) and the petitioner's Motion for Partial Summary Judgment (ECF No. 19).

### PROCEDURAL HISTORY OF PETITIONER'S CASE

#### *The petitioner's criminal proceedings*

The petitioner, who is presently incarcerated at the Mount Olive Correctional Complex in Mount Olive, West Virginia, is serving a life sentence, without mercy, following his conviction, in January of 1998, by a jury in the Circuit Court of Kanawha County, West Virginia, of one count of murder in the first degree, during the

commission of aggravated robbery and burglary.  *State v. Samples*, No. 96-F-160 (Cir. Ct. Kanawha Cty, Jan. 16, 1998).  (ECF No. 10, Ex. 4).  The petitioner was sentenced on February 6, 1998.  (*Id.*, Ex. 6).

<u>*The petitioner's direct appeal*</u>

On June 17, 1998, the petitioner filed a Petition for Appeal in the Supreme Court of Appeals of West Virginia (hereinafter the "SCAWV").  The petition for appeal raised the following grounds for relief:

1.  Whether any reasonable trier of fact could have found the petitioner guilty of felony murder with both aggravated robbery and burglary serving as the underlying offenses since the State of West Virginia failed to prove any elements of aggravated robbery of the items charged in the indictment.  Likewise, the State failed to prove the elements of burglary or entering without breaking, therefore the State failed to show that the victim's murder occurred in the commission of both of the underlying offenses.

2.  Whether the Court below erred  in denying the petitioner's motion of acquittal at the conclusion of the State's case-in-chief in light of the State's failure to establish the time of the victim's death, to present the stabbing murder weapon, to put forth any forensic evidence linking the petitioner to the victim's apartment at the time of her murder, to offer any conclusive evidence as to the (forced) entry into the victim's apartment, and to demonstrate the victim's ownership of the necklace.  In addition, the State could not show that the petitioner was in possession of the stun gun given to the victim early on Sunday morning.   Furthermore,    the State's case was based primarily upon  the testimony of two incredible witnesses, Sandra Wickline (at the time of the trial, Sandra Farrell) and Jeff Johnson.  Finally, the State failed to establish the elements of aggravated robbery and burglary as the predicate offenses necessary for the felony murder conviction.

3.  Whether the Court below erred in denying the petitioner's Motion for Acquittal at the conclusion of all evidence in light of the petitioner's presentation of unrebutted expert testimony concerning the time of the victim's death, the lack of forced entry, the ownership of the necklace, as well as the petitioner's presentation of the lay witness testimony that refuted the incredible testimony of Sandra Wickline and Jeff Johnson.

4.      Whether the Court below erred, as a consequence of its ruling on the petitioner's motions for an acquittal, in giving the jury instructions on the elements of aggravated robbery and burglary as the predicate offenses necessary for the felony murder conviction.

5.      Whether the Court below erred in refusing to exclude two (2) gruesome photographs depicting the strangled body of the alleged victim.

6.      Whether any reasonable trier of fact would have found the petitioner guilty of felony murder since there existed insufficient evidence to convince the jury of the petitioner's guilt beyond a reasonable doubt even if the evidence were viewed in the light most favorable to the prosecution.

(*Id.*, Ex. 7). The Petition for Appeal was refused on November 10, 1998. (*Id.*)

<u>*The petitioner's state habeas corpus proceedings*</u>

On or about October 15, 1999, the petitioner filed a *pro se* Petition for a Writ of Habeas Corpus in the Circuit Court of Kanawha County (Case No. 99-MISC-370). (*Id.*, Ex. 8). In the *pro se* petition, the petitioner raised the following grounds for relief:

1.      Petitioner's constitutional rights to a fair and impartial trial [were denied] when he was denied full notice of charges against him.

2.      Petitioner's constitutional right to a fair and impartial jury trial was violated when the court failed to impanel a petit jury free of all disqualifications.

3.      Petitioner's conviction is based upon a record wholly devoid of verifiable proof of necessary and essential elements of the offenses of robbery or burglary, which the State must prove beyond a reasonable doubt to establish the crime of felony murder. Therefore, the state court proceeding violated the Fourteenth Amendment to the Constitution of the United States and Article III, § 10, Constitution of West Virginia.

4.      Petitioner was denied his constitutional right to effective assistance of counsel as guaranteed by the Sixth Amendment to the U.S. Constitution.

        A.      Counsel failed to request a bifurcated trial.

    B.      Counsel failed to secure a petit jury free of all disqualifications.

    C.      Counsel failed to seek sequestration of the jury despite the magnitude of the charges facing their client.

    D.      Counsel failed to perform tests recommended by Mr. Larry Dehus, a Forensic Scientist, to exclude certain state exhibits.

    E.      Counsel failed to submit the *curriculum vitae* of their defense experts despite the jurors' obvious need for such information when they determined the weight and authority to assign to their testimony.

    F.      Counsel failed to locate or interview Terry Felhauser, who installed the deadbolt on 2222 Zabel Drive, Apt. C, and who had keys to the deceased's apartment.

5.      The cumulative effect of the numerous errors in this case denied Petitioner his right to a fair and impartial trial as guaranteed by the Constitution of West Virginia, Article 3, Sections 10 and 13, and the Constitution of the United States, Amendments VI and XIV.

    A.      The Court failed to assemble a jury free of disqualification.

    B.      The Court failed to sequester the jury.

    C.      The Court failed to bifurcate the trial.

    D.      The Court failed to exclude inherently incredible testimony of Jeff Johnson and Sandra Farrell Wickline.

    E.      The Court failed to exclude gruesome photographs.

    F.      The Court pronounced an instruction on flight despite objection by defense counsel and without requiring the State to create a causal connection between defendant's actions and the crime for which he was charged.

(*Id.*)

On March 3, 2001, the Circuit Court of Kanawha County (King, J.) dismissed the *pro se* petition without addressing the merits of the underlying claims, appointing counsel or conducting an omnibus evidentiary hearing, finding that "the petition contains a mere recitation of grounds without factual support, and, therefore, because

the petition has failed to demonstrate to this Court's satisfaction that the petitioner is entitled to relief, no hearing is required." (*Id.*, Ex. 9).

On June 14, 2001, the petitioner filed a Petition for Appeal concerning the denial of his *pro se* habeas corpus petition. (*Id.*, Ex. 10). The Petition for Appeal raised the following grounds for relief:

A. Was the Circuit Court of Kanawha County clearly wrong when the Court failed to afford the petitioner post-conviction relief on his claim that his constitutional rights to offer mitigating evidence in a separate and distinct sentencing hearing was violated by the Circuit Court['s] unprincipled and arbitrary use of unitary trial procedure in a First Degree Murder case?

B. Was the Circuit Court of Kanawha County clearly wrong when the Court failed to afford the petitioner post-conviction relief on his claim that his constitutional right to the due process of law was violated when the State failed to prove all the essential elements of robbery and burglary?

C. Was the Circuit Court of Kanawha County clearly wrong when the Court failed to afford the petitioner post-conviction relief on his claim that his constitutional right to the effective assistance of counsel, as guaranteed by Article III, § 14 of the Constitution of West Virginia, and the Sixth Amendment to the Constitution of the U.S.A.?

1. Failure to request a bifurcated trial.

2. Failed to secure a jury free of all disqualifications.

3. Failed to seek sequestration of the jury.

4. Failed to perform tests recommended by a forensic scientist to exclude certain exhibits.

5. Failed to submit the *curriculum vitae* of defense experts.

6. Failed to locate or interview Terry Felhauser, who installed the deadbolt in victim's apartment and who had keys thereto.

7. Failed to request instructions on lesser included offenses of robbery and second degree murder.

    D.    Was the Circuit Court of Kanawha County clearly wrong when the Court failed to afford petitioner post-conviction relief on his claim that he was denied his right to a fair and impartial trial as guaranteed by the Constitution of W. Va., Article III, § 10 and 13, and the Sixth and Fourteenth Amendments to the Constitution of the U.S.A. due to the cumulative effect of numerous errors in his criminal trial?

      As his bases for cumulative error, the petitioner's appellate brief discusses the seven claims of ineffective assistance of trial counsel listed in Ground C, plus five grounds of trial court error, including:

        1.    The court failed to assemble a jury free of disqualifications.

        2.    The court failed to sequester the jury.

        3.    The court failed to bifurcate the trial.

        4.    The court failed to exclude testimony of Jeff Johnson and Sandra Wickline.

        5.    The court failed to exclude gruesome photographs.

        6.    The court pronounced an instruction on flight despite an objection by defense counsel and without requiring the State to create a causal link between the defendant's actions and the crime for which he was charged.

    E.    Did the Circuit Court of Kanawha County fail to afford the petitioner his constitutional right to the due process of law as secured by the Fourteenth Amendment to the Constitution of the U.S.A. when the Court failed to specify whether a federal right was presented in each ground raised in petitioner's post-conviction petition?

(*Id.*, Ex. 10).  On December 19, 2001, the SCAWV entered an order directing that a rule be issued against the respondent warden to produce the petitioner in the Circuit Court of Kanawha County for the appointment of counsel and the holding of an omnibus evidentiary hearing on the petitioner's grounds for habeas corpus relief.  (*Id.*)

On September 26, 2006, the petitioner, by counsel, Kanawha County Deputy Public Defenders Gregory L. Ayers and Paula Cunningham, filed an Amended Petition, which raised four primary grounds for habeas corpus relief, and four other "potential claims" raised pursuant to *Losh v. McKenzie*, 277 S.E.2d 606 (W. Va. 1981).  (*Id.*, Ex.12). The grounds raised in the Amended Petition stated as follows:

1. Samples was denied his right to due process of law, a fair sentencing process, a fair and impartial jury, and the effective assistance of counsel guaranteed by the Fourteenth  and  Sixth Amendments to the United States (U.S.) Constitution and Article III, §§ 10 and 14 of the W. Va. Constitution, respectively, when both the trial court and his trial counsel failed to voir dire his trial jurors and determine that they were willing to consider making a recommendation of mercy if they found  Samples  guilty  of  first degree murder.

2. Samples was denied his state and federal due process rights to a fair trial and the effective assistance of counsel, see ¶ [1] above, when the prosecutor in closing argument told the jury it should not recommend mercy, because Samples did not show Joanna Sigmon any mercy; and defense counsel failed to object to this argument.

3. Samples was denied his state and federal constitutional rights to the effective  assistance of counsel, see ¶ [1] above, when his  trial counsel advised the jury, and permitted the jury to be advised, several times, that Samples was a convicted felon who had been to the penitentiary, was on parole at the time of the offense in this case, and had violated his parole; and trial counsel did not request a limiting instruction to the jury concerning this evidence.

4. Samples was denied his constitutional rights to due process of law and to be fully and plainly informed of the nature, character and cause of the accusation guaranteed by the Fourteenth and Sixth Amendments, respectively, to the U.S. Constitution, and Article III, §§ 10 and 14, respectively, of the W. Va. Constitution  when  his indictment for first degree murder failed to allege the  essential elements of felony murder.

Other potential claims (raised under *Losh v. McKenzie*)

A. Samples was denied his constitutional right to the effective assistance of counsel when his trial counsel failed to investigate his background and present mitigating evidence to the jury on his

behalf which could have probably persuaded the jury  to recommend mercy.

B.      Samples was denied his constitutional rights to the effective assistance of counsel when his trial counsel failed to consider bifurcating his trial and failed to discuss bifurcating  his  trial  with him.

C.      Samples was denied his constitutional rights to the effective assistance of counsel when his trial counsel (1) failed to obtain the state police lab information/material (lab notes, bench notes, worksheets, summaries, computer printouts, auto rads, etc.) regarding the lab's DNA testing and evidence in his case; and (2) further failed to investigate that DNA evidence by having an independent expert evaluate that evidence.

D.      Samples was denied his constitutional rights to the effective assistance of counsel when trial counsel failed to adequately investigate Jeff Johnson's background and discover impeachment evidence which could have been presented at trial.

(*Id.*)

On October 31, 2011, Judge King issued an Order denying, on the merits, the four primary grounds for relief raised in the petitioner's Amended Petition.  (*Id.*, Ex. 13). The Order further stated that, at a hearing on March 9, 2011, the court advised the petitioner of his obligation to raise every ground for relief in one proceeding, and reviewed the *Losh* checklist with the petitioner.  An omnibus evidentiary hearing was then held on May 12, 2011, where only the four primary grounds for relief were pursued. Thus, the petitioner abandoned the four "potential claims" identified in his Amended Petition, and the merits of the same were not addressed by the Circuit Court.  (*Id.*)

On November 30, 2011, the petitioner filed a Petition for Appeal from the denial of his Amended Petition filed in the Circuit Court.  (*Id.*, Ex. 14).  The Petition for Appeal raised the following grounds for relief:

1.      The Circuit Court erred in concluding Mr. Samples was not denied a fair and impartial jury, a fair and impartial sentencing process, and

effective assistance of counsel when his trial counsel failed to voir dire the jury on mercy and two jurors indicated in habeas proceedings they would not consider mercy in a first degree murder case.

2.      The Circuit Court erred in ruling Mr. Samples was not denied his constitutional rights to the effective assistance of counsel when (1) defense counsel told the jury and permitted the jury to be told, several times, that he was a convicted felon who had been to the penitentiary, was on parole at the time of the offense, had violated parole, and was running from the police; and (2) defense counsel failed to request a limiting instruction to the jury concerning this evidence.

3.      Since a constitutionally sufficient indictment requires the essential elements and facts constituting the offense to be stated in the indictment, the circuit court erred in ruling that Mr. Samples could be convicted of felony murder when the essential elements and facts of felony murder were not stated in the indictment for first degree murder.

(*Id.*) On April 12, 2013, the SCAWV issued a Memorandum Decision finding no error in the petitioner's conviction and adopting the reasoning of the Circuit Court in denying the petitioner habeas corpus relief. (*Id.*, Ex. 15).

On June 13, 2013, the petitioner filed a third Petition for a Writ of Habeas Corpus in the Circuit Court of Kanawha County (Case No. 13-P-326), which raised the following grounds for relief:

A.      Petitioner was not afforded meaningful and effective assistance of counsel as guaranteed by Article III, § 5 of the Constitution of West Virginia in the initial state post-conviction proceedings pursuant to <u>West Virginia Code</u> § 53-4A-1 *et seq.* when court-appointed habeas counsel failed to present the issue of [sic] that two defense witness[es] were compelled to testify while dressed in distinctive prison garb and obviously under the supervision of armed prison officials.

B.      Petitioner was denied a fair trial as secured by the Fifth, Sixth and Fourteenth Amendments to the Constitution of the U.S.A. when Mr. Pelphrey and Mr. Basham were dressed in prison garb throughout their testimony in petitioner's criminal trial. Defense counsel, Mr.

> Keener and Mr. Victor, failed to object to their witnesses testifying
> while clothed in prison jumpsuits.

(*Id.*, Ex. 17).  On July 19, 2013, Judge King issued a Memorandum Opinion and Order summarily dismissing the petitioner's claims without prejudice.  (*Id.*, Ex. 18).  The petitioner appealed that decision to the SCAWV, which issued a Memorandum Decision affirming the ruling of the Circuit Court on April 4, 2014.  (*Id.*, Ex. 3).

<u>*The petitioner's instant section 2254 petition*[1]</u>

On April 28, 2014, the petitioner filed the instant Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2254, which raises the following grounds for relief:

1.  Petitioner was denied a fair and impartial jury and a fair sentencing process as secured by the First, Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution of the U.S.A. when his trial counsel failed to voir dire the prospective jurors on the mercy issue and two member[s] of the petit jury subsequently acknowledged they would not consider mercy as an option in a 1st Degree Murder case.

2.  Petitioner was denied meaningful and effective assistance of counsel as secured by the First, Sixth, Eighth and Fourteenth Amendments to the Constitution of the U.S.A. by the acts of commission and the acts of omission of Ray Keener, III, Co-Defense Counsel and Matthew Anthony Victor, Co-Defense Counsel.

    A.  Mr. Keener and Mr. Victor did not voir dire the prospective jurors on whether they would impartially consider a recommendation of mercy if they found their client guilty of murder in the first degree (See Ground One).

    B.  Mr. Keener and Mr. Victor informed the jury, and permitted the jury to be informed by the prosecution, that their client was a convicted felon who had been sent to the penitentiary, he was still under supervision when the alleged offenses occurred, he had violated

---

[1] The plaintiff filed a prior section 2254 petition on May 17, 2013 (*Samples v.* Ballard, Case No. 2:13-cv-11638, ECF No. 1).  On March 31, 2014, the presiding District Judge dismissed the prior petition, without prejudice, for failure to exhaust state court remedies.  (*Id.*, ECF Nos. 17 and 18).  The undersigned finds it unnecessary to repeat the claims for relief contained in the first petition.

the terms of his parole, and he was attempting to evade his parole officer.

C.     Mr. Keener and Mr. Victor failed to propose a limiting instruction for the judge to give the jury regarding the [Petitioner's] prior conviction and parole status.

D.     Mr. Keener and Mr. Victor failed to insure that two defense witnesses, Luther Basham and James Pelphrey did not appear before the petit jury in distinctive prison garb in restraints, and obviously under the supervision of prison officers as a violation of Petitioner's right to a fair and impartial jury trial as secured by the Fifth, Sixth, and Fourteenth Amendments of the U.S. Constitution.

3.     The indictment returned by the Grand Jury of Kanawha County, West Virginia, alleged petitioner committed the offense of premeditated First Degree Murder and therefore the indictment was constitutionally insufficient because the essential elements of First Degree Murder, Felony Murder, were not clearly stated in the indictment.

4.     Petitioner was denied due process of law as secured by the Fifth and Fourteenth Amendments to the Constitution of the U.S.A. when the prosecuting attorney failed to prove all elements of robbery or burglary.

5.     The State Court denied petitioner due process of law as secured by the Fifth and Fourteenth Amendments to the Constitution of the U.S.A. when the Circuit Court denied Petitioner's Motion for Acquittal at conclusion of the State's case-in-chief.

6.     Petitioner was denied a fair and impartial jury trial as secured by the Fifth, Sixth and Fourteenth Amendments to the Constitution of the U.S.A. when Mr. J. Pelphrey and Mr. L. Basham were dressed in distinctive prison garb and in restraints through their testimony before the petit jury in petitioner's criminal trial.

7.     Petitioner was denied a fair and impartial trial due to cumulative errors of trial counsel, the prosecuting attorney and the trial court.

(ECF No. 2).

On May 9, 2014, the undersigned entered an Order directing the respondent to file a response to the section 2254 petition by July 9, 2014, with a reply by the petitioner by September 9, 2014.  (ECF No. 8).

On July 9, 2014, the respondent filed a Response to the section 2254 petition (ECF No. 9), a Motion for Summary Judgment (ECF No. 10), and a Memorandum in support thereof (ECF No. 11).

On July 10, 2014, in accordance with the holding of *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the undersigned entered an Order and Notice (ECF No. 14), notifying the petitioner of his right and obligation to respond to the respondent's Motion for Summary Judgment, and setting deadlines of September 9, 2014 for the petitioner's response, and September 23, 2014 for respondent's reply.

On August 19, 2014, the petitioner filed a Motion for Partial Summary Judgment (ECF No. 19).  The respondent filed a Response to the petitioner's Motion for Partial Summary Judgment on August 21, 2014.  (ECF No. 20).  Then, on August 28, 2014, the petitioner filed a Reply [hereinafter "Response"] to the respondent's Motion for Summary Judgment.  (ECF No. 21).  No additional briefing was filed.  This matter is ripe for adjudication.

## **STANDARD OF REVIEW**

Title 28 U.S.C. § 2254(d), which was adopted as part of the Anti-terrorism and Effective Death Penalty Act of 1996 (the "AEDPA") provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000), the Supreme Court held that under the "contrary to" clause, a federal court may grant a writ of habeas corpus with respect to claims adjudicated on the merits in state court only if (1) the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or (2) if the state court decides a case differently from the Supreme Court on a set of materially indistinguishable facts.  The Court further held that under the "unreasonable application" test, a federal court may grant a writ of habeas corpus with respect to a claim adjudicated on the merits in state court only if the state court identifies the correct governing principle from the Supreme Court's decision, but unreasonably applies that principle to the facts of the prisoner's case.  *Id.* at 413.

Moreover, the AEDPA contains a presumption that a state court's factual findings are correct:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1).

Rule 56 of the Federal Rules of Civil Procedure applies to habeas corpus proceedings.  *See*, *e.g.*, *Blackledge v. Allison*, 431 U.S. 63, 81 (1977); *Maynard v. Dixon*, 943 F.2d 407, 412 (4th Cir. 1991).  Entry of summary judgment is appropriate when

there is "'no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Rule 56(c), Fed. R. Civ. P.).

## FACTUAL BACKGROUND AND RELEVANT TESTIMONY

The petitioner's trial transcript (ECF No. 10, Exs. 21-27)[2] is nearly 1600 pages in length.  Rather than summarize the testimony of each witness, the undersigned is providing a summary of the relevant facts, citing to the transcripts where appropriate. Some facts are also derived from the factual summary contained in the petitioner's direct appeal petition.  (ECF No. 10, Ex. 7).

In 1986, the petitioner was convicted of non-aggravated robbery and was sentenced to prison.  (ECF No. 10, Ex. 7).  After being released on parole, the petitioner returned to Charleston, West Virginia, and was living in Apartment C at 2222 Zabel Drive in North Charleston, with his mother.  (*Id.*)  In April 1995, the victim in this case, Joanna Sigmon, moved into Apartment A at 2222 Zabel Drive.  (*Id.*)  According to the testimony at trial, the petitioner had a genuinely friendly, neighborly relationship with Sigmon.  (ECF No. 10, Ex. 24 at 112-113, 130; ECF No. 10, Ex. 26 at 69-71).

On June 23, 1995, a warrant was issued for the petitioner's arrest on violations of his parole conditions.  (ECF No. 10, Ex. 23 at 243-244).  However, he had not been arrested on those charges.

---

[2]  The undersigned notes that Volumes I and III of the trial transcripts are out of order in both the scanned version of the exhibits on the court's CM/ECF system and on the CD-Rom version of the exhibits that was delivered to the court.  According to the respondent's Index of Exhibits (ECF No. 10 at 3-4), Exhibit 21 is listed as Trial Transcript Volume I and Exhibit 23 is listed as Trial Transcript Volume III.  In the versions of the exhibits submitted to the court, Exhibit 21 is actually Trial Transcript Volume III, and Exhibit 23 is Trial Transcript Volume I.  Since it appears that the respondent submitted these exhibits in this manner, rather than directing the Clerk to re-scan these exhibits in the proper order, the undersigned has cited to the Trial Transcripts pursuant to the exhibit number by which each is filed on the CM/ECF system.  Thus, the Index of Exhibits in ECF No. 10 at 3-4 is inaccurate and should be reversed with respect to Exhibits 21 and 23.

According to the testimony of Melinda Garrett, on Saturday, August 12, 1995, she was at Sigmon's apartment preparing to go out for the evening. (ECF No. 10, Ex. 22 at 86-87). Garrett stated that she ironed a dress for Sigmon and left the iron at the foot of her bed. (*Id.*) Garrett testified that, about five minutes before they left to go out, the petitioner burst into Sigmon's apartment. Garrett further stated that Sigmon told the petitioner not to come in without knocking, and then they had a conversation in the kitchen that Garrett did not overhear, then the petitioner left. (*Id.* at 87).[3] Garrett stated that Sigmon told her she was afraid that the petitioner had seen her taking money out of her dresser drawer in the bedroom. (*Id.* at 88).

Garrett also testified that, before they left the apartment, she smoked two Marlboro Light cigarettes with a white filter, which she placed in an ashtray on the coffee table in front of her in the living room. (*Id.* at 88, 109-110). Garrett further testified that the ashtray was otherwise clean when she used it. (*Id.* at 88, 109, 118).

Sigmon and Garrett left in Garrett's car and went to have dinner at Bennigan's in downtown Charleston. (*Id.* at 89-90). Then, they went to several different area bars. However, Sigmon forgot her identification, so they went back to her apartment for a few minutes. Garrett said she waited in the car, and did not see the petitioner anywhere around at that time. (*Id.* at 90-91). Eventually, they proceeded to the Ramada Inn, where Sigmon had a dispute with Melissa Fields and Sandy Hubbard concerning Fields' boyfriend, Chris Moffitt.[4] Sigmon and Garrett subsequently went to the Village Café in

---

[3] In his statement to the police after he was arrested, the petitioner stated that he went over to Sigmon's apartment on Saturday night and told her that if the police came up there, to tell them she hadn't seen him. (ECF No. 10, Ex. 24 at 114).

[4] By the time of the petitioner's trial, Fields had married Chris Moffitt. Thus, the name she used when she testified was Melissa Moffitt. Nevertheless, for continuity, the undersigned will continue to refer to this witness as "Fields."

Sissonville, where Sigmon worked.  However, Fields and her associates subsequently showed up at the Village Café as well, and their argument continued.  (*Id.* at 94).  Fields acknowledged that she threatened Sigmon during the argument and that the owner of the bar and the police were called to come to the bar.  (*Id.* at 95; ECF No. 10, Ex. 27 at 32, 35).  David Walker, the owner of the bar, testified that he arrived at the Village Café around 3:00 a.m., ordered Fields and her group to leave, and gave Sigmon a can of mace and a stun gun.  (ECF No. 10, Ex. 22 at 134; ECF No. 10, Ex. 24 at 177-183, 187-193).

When Sigmon and Garrett left the bar, they discovered that someone had keyed Garrett's car.[5]  Sigmon dropped off Garrett at James Dunn's house in Sissonville, and then allegedly headed home in Garrett's car.  (*Id.* at 127, 144).  Garrett and Dunn both testified that, around 4:30 or 5:00 a.m., they drove back to Sigmon's apartment to get Garrett's car, but it wasn't there, so they returned to Dunn's.  (*Id.* at 98, 145-146).

The evidence demonstrated that Sigmon called Walker at 3:38 a.m. from a pay phone at a Go-Mart and said she was scared to go home.  (ECF No. 10, Ex. 22 at 96; ECF No. 10, Ex. 24 at 183-184, 190-191).  Then, she apparently went to Wolf Pen Drive, in Sissonville, where she talked to Kenny "Tweety" Smith until around 5:30 or 6:00 a.m. (ECF No. 10, Ex. 21 at 5-6).  Tweety, who acknowledged that he was drunk and high on drugs that night, testified that he and Sigmon talked about her problems with the women who had threatened her at the bars earlier in the evening.  (*Id.* at 11-13). Sigmon's caller ID indicates that Tweety called Sigmon at 6:06 a.m., allegedly to make sure that she had gotten home.  The call went unanswered.  (*Id.* at 8).

---

[5]  Fields testified that Amy Miller, who was with her group, was the person who keyed Garrett's car, but stated that she had nothing to do with it.  (ECF No. 10, Ex. 27 at 33).

Meanwhile, that night, the petitioner and his girlfriend, Sandra Farrell (married name Wickline)[6] drove around Charleston consuming alcohol and crack cocaine.  (ECF No. 10, Ex. 24 at 214-216).  Farrell testified that she dropped off the petitioner at his apartment around 3:30 a.m.  (*Id.* at 217).  The petitioner's nephew, David Shaffer, who was staying at the petitioner's apartment that night, confirmed that he saw the petitioner and Farrell come in around 3:30 a.m.  (ECF No. 10, Ex. 24 at 75-76).

The evidence presented at trial indicated that, sometime between 4:00 and 5:00 a.m., the petitioner knocked on his neighbor Reba Butler's door, and told her that he had heard someone in the back of the apartment complex; however, Butler investigated and found no one there.  (ECF No. 10, Ex. 24 at 169-171, 176). Then, according to Butler, the petitioner asked her to drive him down towards the Go-Mart, but she refused to take him.  (*Id.* at 178-179).

On Sunday morning, around 9:00 a.m., Garett and Dunn arrived at 2222 Zabel Drive to pick up Garrett's car and her keys from Sigmon.  (ECF No. 10, Ex. 22 at 99, 146-147).  Garrett and Dunn banged on Sigmon's door for several minutes, but received no answer.  (*Id.*)  At that time, the petitioner came out of his apartment, appearing to have just gotten out of the shower.  (*Id.* at 99-100, 147-148).  Garrett testified that the petitioner had told her that he had heard people at Sigmon's apartment earlier.  (*Id.* at 99).

A short time later, the petitioner went to his grandmother's house to assist her with some chores.  (ECF No. 10, Ex. 24 at 219).  Farrell met him there and then they returned to the Zabel Drive apartment later that evening.  (*Id.* at 219-220).

---

[6]  Because the petitioner's sister's last name is also Wickline, the undersigned will refer to this witness as "Farrell."

On Monday, August 14, 1995, Sigmon's family and friends requested that the petitioner's mother, Ellen Samples, and the landlady of the apartment building assist them in gaining entry to Sigmon's apartment, as they had been unable to contact her. (ECF No. 10, Ex. 22 at 101-102).  The landlady gave Ellen Samples the key to open the door.  (*Id.* at 102-103).  Ellen Samples testified that she heard a click when she attempted to open the top (deadbolt) lock.  (ECF No. 10, Ex. 26 at 83-84).  When they entered the apartment, they found Sigmon's body on her bed.  (ECF No. 10, Ex. 22 at 103).  Sigmon had been stabbed, strangled and had a pillow over her head.  The contents of her purse were dumped all over the bed.  (ECF No. 10, Ex. 21 at 27-30; ECF No. 10, Ex. 26 at 114-15).

Two ligatures were loosely tied around Sigmon's neck (a boot string and an electrical cord from Sigmon's iron).  Sigmon also had two stab wounds in the right side of her neck.  (ECF No. 10, Ex. 25 at 177-179, 189).  At trial, the State Medical Examiner testified that the ligatures were placed around her neck before she was stabbed, and that Sigmon likely died from one of the stab wounds.  (*Id.* at 184-193).  The Medical Examiner also opined that the stab wounds were consistent with a knife blade similar to the knife that the petitioner had given to his great aunt.  (ECF No. 10, Ex. 26 at 11-14).

Based upon food found in her stomach, the state of rigor mortis,  other conditions of her body and the environment, and the timeline that could be established from witnesses, the Medical Examiner estimated that Sigmon's time of death was somewhere around 5:00 a.m. or 6:00 a.m. on Sunday August 13, 1995.  (ECF No. 10, Ex. 25 at 193-208; ECF No. 10, Ex. 26 at 5-7, 34-44).  The petitioner called his own forensic expert, who placed the time of death closer to 5:00 a.m. on Monday, August 14, 1995.  (ECF No. 10, Ex. 26 at 128-172).

At the time that Sigmon's body was discovered, the petitioner was at the Cato Park Pool with his girlfriend, Sandra Farrell, his sister, Karen Wickline and her children, and his nephew, David Shaffer. (ECF No. 10, Ex. 24 at 17-18). While they were at the pool, the petitioner's mother called Karen Wickline and informed her that Sigmon had been found dead in her apartment. (*Id.* at 17-18, 222-223). Instead of going back to the apartment that day, the petitioner went to his grandmother's house, then to his sister's house in Jackson County, and, ultimately went to stay with his 87-year-old great aunt, Louise J. Hughes, in Hurricane, West Virginia. (*Id.* at 27-28, 223-225).

The police responded to Sigmon's apartment and began to collect evidence. Sigmon's shoes and the can of mace were found in Garrett's car. (ECF No. 10, Ex. 22 at 129). However, the stun gun that David Miller had given her was never located.[7] (*Id.*) One of the investigating officers testified that there were pry marks in the area of the spring lock of Sigmon's front door, and that some splinters of wood were found on the living room carpet. (ECF No. 10, Ex. 21 at 32-34, 127). Sigmon's bed was broken, evidencing a struggle in the bedroom, and the left top drawer of her dresser was opened. (ECF No. 10, Ex. 22 at 114-115). Garrett testified that drawer is where Sigmon kept her money. (*Id.* at 115, 118).

The investigators also located two Tylenol sinus tablets, which had been removed from their packaging in the kitchen. One was found on the bedroom floor, and the second, which was broken in half, was found in the waistband of Sigmon's underwear during her autopsy. (ECF No. 10, Ex. 37-38, 44, ; ECF No. 10, Ex. 26 at 8-10). A broken fingernail or nail polish chips were found on the bedroom floor as well. (*Id.* at 45, 51-

---

[7]     Sandra Farrell testified that, around that time, she witnessed the petitioner trade a stun gun for drugs in the East End of Charleston, but she could not remember if it was on Saturday, August 12, 1995 (before Sigmon would have been in possession of a stun gun) or on Sunday, August 13, 1995 (after Sigmon had been given a stun gun by David Walker). (ECF No. 10, Ex. 24 at 239-240).

52).  Approximately one week later, Sigmon's wallet was located behind the toaster in the kitchen by one of Sigmon's family friends.  (ECF No. 10, Ex. 21 at 174-175).

The only item of evidence in the apartment that tied the petitioner to the crime scene is a cigarette butt, with a brown filter, that was found in an ashtray that was located on a table in the corner of the living room.  (ECF No. 10, Ex. 21 at 34).  That cigarette butt was later revealed to contain the petitioner's DNA.  (ECF No. 10, Ex. 25 at 142-143).  Two other cigarette butts, with white filters, were located in the same ashtray.  Testing revealed that the other two cigarettes were smoked by Melinda Garrett.  (*Id.* at 141-142).  Garrett testified that, in pictures taken by the crime scene investigators, the ashtray had been moved from the coffee table where it was placed when she used it before she and Sigmon went out that night.  (ECF No. 10, Ex. 22 at 109-110).

On Monday, August 14, 1995, the petitioner gave his sister, Karen Wickline, and his girlfriend, Sandra Farrell, some jewelry, which they pawned at N & M Gold & Pawn.  (ECF No. 10, Ex. 21 at 18-186; ECF No. 10, Ex. 24 at 9-16, 220-222).  Ronald Bauer, an employee of Reed's Jewelers, testified that the pawned jewelry was identical to items purchased at Reed's by Joanna Sigmon.  (ECF No. 10, Ex. 24 at 51-63).  Several other witnesses testified about seeing Sigmon with similar jewelry.  (*Id.* at 42-44).  However, the petitioner presented the testimony of a former neighbor, Melissa Ann Bays, who testified that, around February or March of 1995, she moved out of a residence near the apartments on Zabel Drive and left a number of items stored in the petitioner's garage.  She stated that she told the petitioner he could have anything she left.  (ECF No. 10, Ex. 26 at 88-92).  Bays testified that some of the jewelry that was pawned by Wickline and Farrell (two necklaces) was jewelry that she had left behind when she moved.  (*Id.* at 92-95).

Testimony adduced at trial indicated that the petitioner gave a knife to his great aunt, Louise Hughes, and asked her to clean it. (ECF No. 10, Ex. 24 at 29-31). The State believed this knife was the murder weapon; however, they did not conduct any DNA or other testing on it. Hughes testified that she collected knives and that it was not unusual for the petitioner to bring her knives. (*Id.* at 29, 33, 36). The petitioner was arrested at Hughes' home on the parole violation warrant around midnight on August 16, 1995. (ECF No. 10, Ex. 23 at 207-208; ECF No. 10, Ex. 24 at 98-99). By that time, the petitioner was also a suspect in the Sigmon murder; however, he was not arrested on those charges. (ECF No. 10, Ex. 23 at 208-209).

After his arrest, the petitioner was taken to the police station and questioned. A recorded statement taken from him at that time was read to the jury at trial through the testimony of the officer who took the statement. (ECF No. 10, Ex. 24 at 109-131). The petitioner denied killing Sigmon and described his whereabouts and activities on Saturday, August 12, 1995 and Sunday, August 13, 1995. (*Id.*) The petitioner elected not to testify at trial.

While the petitioner was at the police station, Sandra Farrell came to see him. At trial, Farrell testified that, during their visit, the petitioner confessed to killing Sigmon. However, after telling the police about the alleged confession, Farrell subsequently recanted her statement implicating the petitioner during an interview with defense counsel. She then reversed her testimony again at trial. (ECF No. 10, Ex. 24 at 225-230; ECF No. 10, Ex. 25 at 16-24). She was strenuously cross-examined about the changes in her testimony and her motivations against the petitioner. (ECF No. 10, Ex. 25 at 24-53).

The petitioner was charged with first degree murder, aggravated robbery and burglary. As a result of these charges, the petitioner's parole was revoked and he was

sent to the Mount Olive Correctional Complex to serve the remainder of his prior sentence.  While incarcerated at Mount Olive, the plaintiff allegedly had a conversation with an inmate named Jeff Johnson, in which the petitioner confessed details about the Sigmon crime to Johnson.  According to Johnson, this confession was allegedly made in the presence of another inmate, James Pelphrey.  Johnson further testified that the petitioner also made statements about the disposal of Sigmon's jewelry in the presence of inmate Luther Basham.  (ECF No. 10, Ex. 25 at 63-77).

At trial, Johnson, who had been released on parole, testified on behalf of the State in plain clothes.  Johnson testified about what he allegedly overheard, and he was cross-examined about being a "professional snitch" who hoped to receive benefits for his testimony.  (*Id.* at 78-116).  Pelphrey and Basham, who were still incarcerated at the time of the trial, were dressed in prison garb and restrained when they testified for the defense.  Both stated that these alleged conversations never took place.  (ECF No. 10, Ex. 26 at 203-229).

## **ANALYSIS**

### A.    **Grounds 1 and 2(A) – Failure to conduct *voir dire* regarding the ability to recommend mercy.**

In Ground 1 of his section 2254 petition, the petitioner asserts that he was denied the right to a fair and impartial jury trial, a fair sentencing process, due process of law and the effective assistance of counsel because defense counsel failed to question the jury pool during *voir dire* concerning their ability to grant mercy if the defendant were convicted of first degree murder.  The petitioner contends that he was substantially prejudiced by this conduct because, after the trial, two jurors acknowledged that they

would not consider granting mercy to a defendant convicted of first degree murder.

Ground 1 of the petition further states:

> In West Virginia, a defendant on trial for first degree murder, an offense carrying a possible life sentence without eligibility for parole, is entitled to question prospective jurors on *voir dire* to determine whether the prospective juror is unalterably opposed to making a recommendation of mercy.  Petitioner could not receive a fair trial on the issue of mercy where there are jurors on the petit jury who could not or would not fairly and impartially consider a life sentence with a recommendation of mercy. Any such prospective juror would be unqualified and subject to challenge for cause.

> The state habeas court found that the prosecuting attorney during *voir dire* had asked the prospective jurors as a group whether they could return a guilty verdict without a recommendation of mercy.  All prospective jurors said they could.  On the other hand, defense counsel did not ask any juror if he would be willing to consider a recommendation [for] mercy if the defendant was found guilty of first degree murder.

> At the post-conviction proceedings, Ray Keener, defense counsel, agreed that it would be important to have individuals who would be willing to consider mercy on the petit jury.  And, he confessed he did not know why he and Mr. Victor did not *voir dire* the prospective jurors on the issue of mercy.  Mr. Matthew A. Victor, Keener's co-counsel, indicated that whether a defense counsel should *voir dire* prospective jurors on the mercy issue depends on the theory of the defense. Mr. Victor confessed he did not *voir dire* prospective jurors on the issue of mercy because such questions would be inconsistent with the defense that the defendant did not commit the crime.

> Kimbra Clinton and David Bauer completed the Juror Questionnaires sent to them by habeas counsel.  Ms. Clinton and Mr. Bauer indicated that they would not be willing to consider mercy in a case where the defendant is convicted of first degree murder.  Ms. Clinton explicitly stated, "if the conviction is for first degree murder, I would not recommend mercy."  Mr. Bauer's response states, "If the accused would be found guilty of 1st degree murder by me, based on the evidence presented by the prosecution and not (successfully) refuted by the defense, I believe the defendant should not be afforded the opportunity of freedom."

> Gina Stanley, a recognized expert witness on criminal defense issues, found that counsel's failure to *voir dire* the jury on mercy constituted ineffective assistance of counsel.  Ms. Stanley testified that defense counsel's performance was deficient because petitioner would need jurors who would be willing to consider mercy if he was convicted of

first degree murder. In her expert opinion, any juror unwilling to consider mercy could be challenged for cause. According to this expert, counsel's failure to *voir dire* the prospective jurors on mercy was not a reasonable trial strategy.

(ECF No. 2 at 6). The petitioner repeats his ineffective assistance of counsel claim on this basis in Ground 2(A) of his petition. (*Id.* at 8).

The petitioner raised this claim in his state habeas corpus proceedings. In the Order denying the petitioner's Amended Petition, the Circuit Court made the following findings of fact concerning this claim:

1. During *voir dire*, the State of West Virginia asked jurors whether, if warranted by the evidence, they could return a verdict of life without mercy. Defense counsel did not inquire on this issue.

2. Trial counsel, Matthew Victor, testified that not inquiring about mercy during *voir dire* was a strategy decision due to the defense theory that the defendant did not commit the murder. (Mr. Keener, co-counsel, did not make a similar assertion.)

3. Attorney Gina Stanley, defense expert, testified that she had tried fifteen (15) to twenty (20) murder cases . . . . She testified that it was ineffective assistance of counsel not to inquire about the mercy issue on *voir dire*, she also testified that she always inquired, but that in her experience, no juror had ever responded that they would not consider mercy.

4. Kimbra Clinton, a juror during petitioner's trial, testified that it seemed illogical for the defense to argue their client was innocent, yet inquire as to the jury's willingness to grant mercy. She testified that she followed the Court's instructions, including the mercy instructions, and based her verdict on the evidence she heard, and,

5. David Bower (Bauer), another juror, testified that he believed an inquiry on the mercy issue would have been inconsistent with the defense in the case. He also testified that if asked in *voir dire* about mercy, it would depend on the circumstances of the case. (*SER Samples v. Ballard*, Circuit Court of Kanawha County, Case No. 99-MISC-370, "Order," 10-31-11, p. 2).

(ECF No. 10, Ex. 13 at 2). The Circuit Court then made the following legal conclusion:

The petitioner was not unfairly convicted due to the failure to inquire about mercy during *voir dire*. The jury was properly instructed on parole eligibility should the jury attach a recommendation of mercy. The strategy of the defense was one of complete innocence. Both sides argued at the conclusion of the case. (*SER Samples v. Ballard*, Circuit Court of Kanawha County, Case No. 99-MISC-370, "Order," 10-31-11, p. 2).

(*Id.*) The SCAWV affirmed those findings, concluding that:

 In this case, it cannot be said that counsel's performance was deficient under an objective standard of reasonableness or that there is a reasonable probability that the result of the proceedings would have been different but for counsel's alleged unprofessional errors. Further, in reviewing counsel's performance under an objective standard in light of the circumstances, this Court finds that a reasonable lawyer would have acted as defense counsel acted. Under these standards and the facts of this case, petitioner was not denied his right to the effective assistance of counsel.

(ECF No. 10, Ex. 15 at 3). The SCAWV further found that "the circuit court did not abuse its discretion in its findings regarding jury selection and the sentencing process." (*Id.* at 2).

The respondent's Memorandum of Law in support of his Motion for Summary Judgment asserts that the petitioner cannot demonstrate that he suffered a violation of his constitutional rights due to his counsel's failure to conduct *voir dire* on the mercy issue, because his counsel made the strategic decision to forego such questioning in light of their theory that petitioner did not commit the murder, and because the prosecutor initiated an inquiry on the issue of mercy. (ECF No. 11 at 18-19). The Memorandum of Law states:

While Petitioner may have been entitled to voir dire examination on the basis of mercy should he have requested such examination, nothing in the record suggests that Petitioner instructed trial counsel to engage in such questioning. "Voir dire examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges." *Mu'Min v. Virginia*, 500 U.S. 415, 431 (1991). Under West Virginia law, the defendant is entitled to question jurors on voir dire regarding whether any of them are opposed to recommending mercy. *State v. Williams*, 30 S.E.2d 251 (W. Va. 1983).

However, counsel must be given "wide latitude" in making strategic and tactical decisions on how to proceed in a criminal action. *Strickland v. Washington*, 466 U.S. 668, 680 (1984).

Here, Petitioner asserts that two jurors, Kimbra Clinton and David Bauer, have subsequently stated that they would be unable to render mercy unto the defendant in a first-degree murder case. While Petitioner is admittedly correct in asserting that such a right to question the jurors on the topic of mercy during voir dire exists, Petitioner has failed to demonstrate how trial counsel's failure to do so amounted to a violation of his constitutional rights. Pursuant to *Strickland*, trial counsel is allowed to forego such entitlements in the interest of trial strategy, which a habeas court must observe unless unreasonable. [FN 1]. Here, counsel for Petitioner during his criminal trial forewent questioning jurors on whether they would be able to grant mercy upon conviction in favor of preventing any negative presumption of Petitioner's guilt.

[FN 1 – In the Circuit Court of Kanawha County's October 31, 2011 Order, the court found, upon testimony of Matthew Victor, trial counsel for Petitioner, that the decision to forego questioning the jury about mercy was a "strategy decision due to the defense theory of the case that the defendant did not commit the murder." (Resp't's Ex. 13).]

(*Id.* at 18).

On August 19, 2014, the petitioner filed a Motion for Partial Summary Judgment (ECF No. 19) asserting that <u>he</u> is entitled to judgment as a matter of law on Ground One of his petition concerning the failure to *voir dire* prospective jurors concerning their willingness to consider mercy in a first degree murder case. The petitioner's motion relies upon the following clearly-established federal precedent:

The Sixth Amendment's right to a trial by jury "guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors," <u>Irvin v. Dowd</u>, 366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 751 (1961). A juror's verdict must "be based upon the evidence developed at trial . . . regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station of life which he occupies." *Ibid.* "The 6th Amendment secures to criminal defendants the right to trial by an impartial jury." <u>Skilling v. U.S.</u>, 561 U.S. ____, 130 S. Ct. 2896, 2912-13, 177 L. Ed.2d 619 (2010).

A trial court must examine prospective jurors in order to reveal any potential bias. The purpose of the *voir dire* is to enable the court to select

an impartial jury and assist counsel [to] exercise their peremptory challenges, *Mu'Min v. Virginia*, 500 U.S. 415, 431, (U.S., 1997). "The *voir dire* plays a critical function in assuring a criminal defendant that his 6th Amendment right to an impartial jury will be honored." *Rosales-Lopez v. U.S.*, 451 U.S. 182, 188, 68 L. Ed.2d 22, 101 S. Ct. 1629 (1981). In state trials, the impairment of a statutory right to peremptory challenges violates due process when "the defendant does not receive what state law provides," *Ross v. Oklahoma*, 487 U.S. 81, 89 (1988). This petitioner was denied his constitutional right to a fair and impartial jury as secured by the U.S. Constitution, *Morgan v. Illinois*, 504 U.S. 719, 727-729, 112 S. Ct. 2222, 2228-2230 (1992); *Irvin*, 366 U.S. 717, 728, 81 S. Ct. 1639, 1641-42 (1961).

(ECF No. 19 at 3).

The petitioner's motion asserts that "Defense counsel's failure to individually ask each specific juror if he was unalterably opposed to making a recommendation of mercy in any circumstances in which a verdict of guilty is returned deprived this petitioner of a jury panel free of bias." (*Id.* at 8). The motion further asserts, "[l]ikewise, the trial judge who presumably had access to the completed jurors' questionnaires failed to ensure that an impartial jury was impaneled when the Court failed to ask each prospective juror individually if he was unalterably opposed to making a recommendation of mercy in any circumstances in which a verdict of guilty is returned." (*Id.*)

The petitioner's motion further emphasizes a statement made by his trial counsel, Matthew Victor, in a separate matter in which he served as habeas counsel, almost six years after the petitioner's trial. The petitioner's motion states:

In 2004, Mr. Victor would contend that an attorney appointed to offer a defense to a charge of murder must, in all homicide cases, explore a prospective juror's bias in refusing to recommend mercy across the board. He wrote:

(T)he issue of ineffective assistance of counsel should be framed in terms of the trial counsel's failure to offer or request any *voir dire* questions regarding the prospective

juror's willingness to consider mercy during the sentencing stage of the trial should there be a conviction on the underlying first-degree Murder charge.  The record in this regard is starkly devoid of any questions regarding the issue of sentencing in general and the issue of mercy in particular.  *State v. Williams*, 30 S.E.2d 251 (W. Va. 1983) *mandates the trial counsel's exploration of the prospective juror's potential bias in refusing to recommend mercy across the board.*  While declining to reverse Williams' conviction because of the vagueness of the defendant's counsel's question to the venire, *the West Virginia Supreme Court of Appeals was unequivocal in reminding counsel to always explore any bias of prospective jurors, including potential sentencing bias.*  *Calvin Gray v. Michael Coleman*, [SCAWV], "Petition for Appeal," Circuit Court of Kanawha County, WV, 98-MISC-545; See Respondent's Exhibit "8," *Samples v. Ballard*, U.S. District Court, # 13-CV-11638 (Emphasis added).

(*Id.* at 9).

The petitioner's Motion for Summary Judgment further asserts that several federal appellate courts have held that a trial court's failure to dismiss a biased juror is reversible *per se*.  *See, e.g., Solis v. Cockrell*, 342 F.3d 392, 400 n.44 (5th Cir. 2003); *Johnson v. Armontrout*, 961 F.3d 748, 756 (8th Cir. 1992).  The petitioner contends that he was denied his federal constitutional right to a fair and impartial jury trial "by the presence on the petit jury of two jurors who would not follow the court's instructions and give meaningful consideration to adding a recommendation of mercy to their verdict of guilty under any circumstances. [Footnote omitted]."  (ECF No. 19 at 9-10).  Consequently, the petitioner further contends that the state court decisions denying the petitioner habeas corpus relief on this issue resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court, and resulted in a decision that was based upon an

unreasonable determination of the facts in light of the evidence presented in the state court proceedings.  (*Id.* at 10).

As noted previously herein, Mr. Victor testified during the petitioner's state court omnibus hearing and stated that he made a strategic choice not to question the prospective jurors on the issue of mercy because it was inconsistent with the defense theory that the petitioner did not commit the murder.  (ECF No. 10, Ex. 30 at 67-70). Co-defense counsel, Mr. Keener, acknowledged that it would be important to have jurors who would willingly consider a recommendation of mercy, and stated that he did not know why they did not conduct such *voir dire.*  (*Id.* at 82).

The petitioner also called an expert witness on this issue.  Ms. Gina Stanley, a lawyer in Huntington, West Virginia, was recognized as an expert witness and she gave her opinion that the failure to question the jury pool on the issue of whether they could recommend mercy constituted objectively deficient performance by Mr. Victor and Mr. Keener because, in her opinion, trial counsel had to *voir dire* the prospective jurors on the issue of mercy in order to be in a position to challenge for cause any prospective juror who was not willing to give meaningful consideration to a recommendation of mercy.  (ECF No. 19 at 11; ECF No. 10, Ex. 30 at 101-108).  As noted in the petitioner's motion, Ms. Stanley further testified that the petitioner was prejudiced by this decision "since the evidence tying petitioner to the crime scene was sparse and the case was of a type where jurors would consider mercy."  (ECF No. 19 at 12).

The petitioner further asserts that:

> Mr. Victor and Mr. Keener chose trial tactics that was [sic; were] not consistent with petitioner's claim that he was innocent of the homicide or a goal of mitigating punishment if found guilty.  Whether defense counsel was cognizant of the <u>Williams</u> decision (supra pp. 7-10, 15) and consciously ignored the Supreme Court mandate is unknown.  What is

> known [is] that their claimed strategic tactics failed to eliminate biased jurors from the jury.
>
> Defense counsel did not have a mitigation strategy if petitioner was found guilty.  Counsel's decision not to question the prospective jurors on the mercy recommendation was so ill-chosen that it permeated the entire sentencing procedure with obvious unfairness."  _Hughes v. U.S._, 258 F.3d 453, 457 (6th Cir. 2001).

(_Id._ at 12-13).  The petitioner then appears to assert that his counsel should have sought a bifurcated trial, so that he could maintain his innocence during the guilt phase, but also argue for mercy if he were found guilty.  (_Id._ at 13).  However, that specific claim was abandoned in the petitioner's state habeas an appeal.  Thus, it is waived.

Finally, the petitioner disputes the respondent's assertion that there was no reason for defense counsel to question the jurors on the issue of mercy because the prosecutor had already done so and "the members of the jury unanimously stated that they would be able to render mercy if they thought it to be necessary."  (Quoting from the respondent's Memorandum of Law, ECF No. 11 at 19).  The petitioner contends: "That statement may give greater credit to the prosecuting attorney than the record allows."  (ECF No. 19 at 14).  The petitioner then quotes the question asked by Assistant Prosecuting Attorney Virginia Grottendieck during _voir dire_, which states:

> I am going to ask you to look at this defendant, and I am going to tell you that at the end of this case the State is going to ask you to return a verdict of guilty of first-degree murder _without mercy_, and that would mean that this defendant would spend the rest of his life in jail without the possibility of parole.  Is there anyone here who does not feel that they would be able to return such a verdict if the evidence did warrant that?  _State v. Samples_, Circuit Court of Kanawha County, 96-F-160, January 7, 1998, p. 140 (lines 21-22), p. 141 (lines 1-8).

(ECF No. 19 at 14, quoting from ECF No. 10, Ex. 23 at 140-141).  The petitioner further notes that "[t]he record is silent as to the response or lack of response of the prospective jurors."  (ECF No. 19 at 14).

Thus, as aptly noted by the petitioner, the prosecutor asked whether any of the prospective jurors would be <u>unable to return a verdict without mercy</u>, but no one asked the prospective jurors if any of them would be <u>unable to return a verdict recommending mercy</u>. The petitioner further contends:

> A unanimous jury voted to find petitioner guilty of murder in the 1st degree. The law is silent on whether the decision to recommend mercy must also be unanimous. At least two petit jurors were opposed to recommending mercy in any circumstances. A more searching *voir dire* by defense counsel would have removed Ms. Clinton and Mr. Bauer from the jury and there is a "reasonable probability at [sic; that] the verdict would have been different. *Kimmelman v. Morrison*, 477 U.S. 365, 375, 106 S. Ct. 2574, 91 L. Ed.2d 306 (1986). The Supreme Court has rejected the proposition that a defendant must prove that it is more likely than not that the outcome would have been differed [sic; different]." *Strickland*, 466 U.S. 693; *Woodford v. Visciotti*, 537 U.S. 19, 22 (2002).

(ECF No. 19 at 16).

The respondent's Response to the petitioner's Motion for Partial Summary Judgment asserts that the petitioner's claim is meritless. (ECF No. 20 at 1). The Response further states:

> Trial counsel made a tactical decision to forego questioning jurors on the basis of mercy to cast Petitioner in an innocent light. A pre-trial effort to question the jurors on the basis of mercy in the event they find Petitioner guilty would have merely worked to undermine the assertion that Petitioner was innocent. As such, trial counsel has committed no error, and has performed effectively under both *Strickland v. Washington*, 466 U.S. 668, 680 (1984) and established West Virginia law. Further, Petitioner is simply without proof to show he has been unfairly prejudiced despite ample opportunities to provide evidence beyond mere speculation.

(*Id.*)

The petitioner's Response to the respondent's Motion for Summary Judgment (ECF No. 21 at 2) incorporates the arguments made in his own Motion for Partial Summary Judgment concerning this claim.

In *Strickland v. Washington*, 466 U.S. 688 (1984), the Supreme Court adopted a two-prong test for determining whether a defendant received adequate assistance of counsel.  A defendant must show (1) that counsel's representation fell below an objective standard of reasonableness; and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 687-91.  Moreover, "judicial scrutiny of counsel's performance must be highly deferential."  *Id.* at 689.  Furthermore, the AEDPA "adds a layer of respect for a state court's application of the legal standard."  *Holman v. Gilmore*, 126 F.3d 876, 881 (7th Cir. 1997).

In reviewing a trial counsel's performance, there is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance, *id.* at 689, and the burden is on the Petitioner to show prejudice.  *Hutchins v. Garrison*, 724 F.2d 1425 (4th Cir. 1983).  Further, "[a] convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."  *Strickland*, 466 U.S. at 690.  A petitioner may not merely speculate about potential prejudice but must "affirmatively prove" that the result of the proceedings would have been different but for the deficient performance of trial counsel.  *See Strickland*, 466 U.S. at 693.  Using this standard, the undersigned will address each of Petitioner's claims of ineffective assistance of counsel.

A defendant is guaranteed a trial by an impartial jury under the Sixth and Fourteenth Amendments.  *See, e.g., Duncan v. Louisiana*, 391 U.S. 145, 149 (1968); *Sheppard v. Maxwell*, 384 U.S. 333, 362 (1966) ("Due Process requires that the accused receive a trial by an impartial jury free from outside influence.").  Furthermore, "[t]he

'essential function of voir dire is to allow for the impaneling of a fair and impartial jury through questions which permit the intelligent exercise of challenges by counsel . . . .'" *United States v. Brown*, 799 F.2d 134, 135-36 (4th Cir. 1986) (other citations omitted). However, absent contrary indications, jurors are presumed to be impartial and courts will presume that jurors will follow the court's instructions. *Jones v. United States*, 527 U.S. 373, 394 (1999); *Poynter v. Ratcliff*, 874 F.2d 219, 221 (4th Cir. 1989).

In the instant case, the evidence clearly demonstrates that trial counsels' failure to question the proposed jurors concerning their ability to grant mercy if the defendant were convicted of first degree murder was a strategic decision, and it is well-settled that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. The petitioner's trial counsel chose not to question the jury about mercy because they did not want to appear to be conceding the petitioner's guilt when his defense was that he did not commit the crime. *See, e.g., Muncy v. McBride*, 2009 WL 3190453 at 4 (S.D. W. Va., Sept. 30, 2009) (counsel was not ineffective for failing to inquire about ability to grant mercy during *voir dire*).

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the petitioner has not overcome the strong presumption that counsel's trial strategy was sound and reasonable under the totality of the circumstances, and thus, he cannot establish that his counsel provided constitutionally ineffective assistance, or that he was denied a fair trial as a result of this conduct. The undersigned further proposes that the presiding District Judge **FIND** that the state court decisions denying the petitioner habeas corpus relief were neither contrary to, nor an unreasonable application of, clearly-established federal law; nor were they based upon an unreasonable

determination of the facts in light of evidence presented in the state court proceedings. Thus, the respondent, not the petitioner, is entitled to judgment as a matter of law on Grounds 1 and 2(A) of the petitioner's section 2254 petition.

### B.    Grounds 2(B) and 2(C) – Introduction of evidence of the petitioner's criminal history and the failure to seek a limiting instruction.

In Ground 2(B) of his section 2254 petition, the petitioner contends that his trial counsel provided ineffective assistance when they informed the jury, or allowed the jury to be informed, that the petitioner was a convicted felon and was on parole at the time that the instant crimes occurred, and that the petitioner had violated the terms of his parole and was attempting to evade his parole officer.  (ECF No. 2 at 8).  The petition cites to numerous instances in the trial transcripts where such references were made. (*Id.*, citations omitted).  The petitioner also offered the opinion of his expert witness, Gina Stanley, who testified that, when a juror hears such evidence, he is more likely to believe that the defendant is guilty.  (*Id.*)

In Ground 2(C) of his section 2254 petition, the petitioner further asserts that his trial counsel was ineffective in failing to seek a limiting instruction concerning his prior conviction and parole status.  (*Id.*)  In support of this claim the petitioner contends as follows:

> Mr. Keener and Mr. Victor failed to propose a limiting instruction for the judge to give the jury regarding the prior conviction and parole status. While the state courts denied relief on this issue, the [SCAWV] recently reversed and remanded the conviction of Gary R. Baker due to the prejudicial impact of the jury being told he was not parole [sic; on parole?] at the time of charged offense.  Syl. Pt. 3, *State v. Baker*, 11-0915, [SCAWV], 02-21-13.  The Court ruled that "evidence of a defendant's parole status should be considered evidence of other crimes for purposes of analysis under Rule 404(b) of the WV Rules of Evidence.  The jury was never told they could not consider evidence of a collateral crime as proof of the defendant's guilt of homicide.  During jury deliberations, the jury sent

a note to the Court requesting a copy of defendant's "prior criminal record." (Tr. Vol. VII, 11). Defendant's prior conviction was for robbery ("purse snatching") and he was accused of aggravated robbery in the indictment returned by the Grand Jury of Kanawha County.

(*Id.*)

The respondent's Memorandum of Law addresses Ground 2(B) as follows:

Trial counsel revealed, during the Circuit Court's omnibus hearing on Petitioner's constitutional claims, that the decision to inform the jury of Petitioner's parole status was a trial strategy intended to explain why Petitioner had fled and attempted to evade police by staying at his aunt's home. [Footnote omitted]. (Resp't's Ex. 13.) Trial counsel attempted to vet the jury on this topic during voir dire to prevent prejudice once the information was revealed during trial. *Id.* While such information may, in fact, be prejudicial in nature, trial counsel was trying to avoid the far more prejudicial inference that Petitioner was fleeing police to avoid being caught for the aggravated robbery, burglary and murder of the victim.

As for the jury's knowledge of Petitioner's status as a convicted felon, apart from the connotation of such from the fact that Petitioner was on probation at the time of the murder, both the State and Petitioner had one and two witnesses, respectively, who were inmates that Petitioner spoke with while incarcerated. By this measure, it would have been impossible for Petitioner to introduce even his own witnesses in his defense without first indicating to the jury that he was, in fact, a convicted felon.

(ECF No. 11 at 20-21).

The respondent contends that the petitioner cannot meet either prong of the

*Strickland* test concerning this claim. His Memorandum of Law further states:

Based upon the defense of Petitioner, trial counsel was forced to explain why Petitioner fled the scene of the crime and basically attempted to hide from the police. In bolstering Petitioner's defense, trial counsel needed the testimony of two incarcerated witnesses regarding communications which took place while Petitioner himself was incarcerated. Therefore, trial counsel's admission that Petitioner was both on parole and was a convicted felon was nothing short of necessary to provide Petitioner with the best defense available.

(*Id.* at 21). Concerning the prejudice prong, the respondent further states:

> [S]hould the trial counsel have done the inverse by keeping the Petitioner's conviction and parole status away from the jury, Petitioner would be left with no excuse as to why he fled the police and attempted to evade capture, would be left defenseless as to the communications which took part during his incarceration, and would have been revealed to have been incarcerated at some point regardless, due to Mr. Johnson as a witness for the state.

(*Id.* at 21-22).

Turning to the claim that defense counsel should have requested a limiting instruction concerning the petitioner's criminal history, the respondent contends that such an instruction was not required under West Virginia law until 2004, six years after the petitioner's trial.  (*Id.* at 22).  The respondent also attempts to distinguish the 2013 decision of the SCAWV in *State v. Baker*, 738 S.E.2d 909 (W. Va. 2013), which is relied upon by the petitioner.  The Memorandum of Law states:

> [T]he facts of *Baker* are quite different, as counsel for [Baker] had previously moved the court to preclude the State from introducing evidence of the defendant's past acts.  Later in the trial, the State asserted that trial counsel for the defense had "opened the door," and the trial court agreed, thereby allowing information to reach the jury of the defendant's prior bad acts.  *Id.* W. Va. at 410, S.E. 2d at 912.  Upon appeal, the [SCAWV] disagreed with the trial court, opined that the admission of the evidence was unsupported by the State's assertion, and reversed and remanded the case for a new trial.  *Id.* W. Va. at 417, S.E. 2d at 919.
>
> Here, trial counsel for Petitioner cannot be deemed deficient.  Trial counsel needed the "wide latitude" provided under *Strickland* to explain why Petitioner fled the scene and combat a witness of the State who basically asserted that Petitioner confessed to the crime charged.  While strategy itself dictated that trial counsel could have moved for a limiting instruction and attempted to preclude any evidence of Petitioner's probation status, the result would be trial counsel's inability to explain Petitioner's evasion and effectively cross Mr. Johnson.

(ECF No. 11 at 22-23).

The petitioner's Response to the respondent's Motion for Summary Judgment contends that "[f]ederal law establishes that 'the introduction of evidence of a

defendant's prior criminal acts risks significant prejudice.'" *Almendarez-Torres v. United States,* 523 U.S. 224, 235, 118 S. Ct. 1219, 1226 (1998).  (ECF No. 21 at 2).  The petitioner further emphasizes that the risk of prejudice in this instance was especially great, given the fact that the petitioner's prior criminal history was of a similar nature to at least one of the offenses with which the petitioner was charged.  *Old Chief v. United States*, 519 U.S. 172, 185, 117 S. Ct. 644, 652 (1997).  (*Id.*)  This position was bolstered by the petitioner's expert witness, Gina Stanley, at his omnibus hearing.  (ECF No. 10, Ex. 30 at 113-115).  The Response further states:

> Federal courts have recognized that unwarranted revelation of a defendant's parole status is prejudicial.  In "most criminal trials the revelation of the defendant's parole status might provoke a mistrial because it would inform the jury that the defendant had a prior criminal history," *U.S. v. Hines*, 943 U.S. 348, 353 (4th Cir. 1991).  Knowledge that a defendant was a parolee when the charged crime happened is not harmless error because of the potential for an "emotional reaction among the jurors, especially those who harbor strong feelings about recidivism and the premature release of those in prison for crime." *U.S. v. Calhoun*, 544 F.3d 291, 296 (6th Cir. 1976).  State courts have also recognized that unnecessary revelation of a defendant's parole status is prejudicial. *Commonwealth v. Moore*, 715 A.2d 448, 451 (Pa. Super. 1998); *People v. Allen*, 77 Cal. App.3d 924, 935 (Cal. Ct. App. 1978).

(ECF No. 21 at 3).

The petitioner further disputes the respondent's contention that a limiting instruction on the petitioner's criminal history or other prior bad acts was not required until 2004.  The petitioner relies upon the SCAWV's decision in *State v. McGinnis*, 455 S.E.2d 516 (1994), which was decided almost four years before the petitioner's trial.  Thus, the petitioner contends that "full compliance with *State v. McGinnis* required the trial court to give limiting instructions prior to petitioner's trial." [Other citations omitted].  (ECF No. 21 at 4).  In *McGinnis*, however, the court was focused on the introduction of prior bad acts by the prosecution.  The decision does not indicate

whether such a limiting instruction was necessary in the circumstance where the defendant elects to preemptively introduce the prior bad acts himself.

The petitioner further asserts that, at his omnibus hearing, Mr. Keener agreed that they should have asked for a limiting instruction.  (ECF No. 21 at 4; ECF No. 10, Ex. 30 at 91).  Mr. Victor acknowledged that they could have asked for such an instruction, and could not pinpoint why they did not.  (ECF No. 21 at 4-5; ECF No. 10, Ex. 30 at 60).

After the omnibus hearing, the Circuit Court made the following findings of fact concerning the plaintiff's claims concerning the admission of his criminal history:

1.  Trial counsel advised the jury in voir dire that petitioner was running from the police because he had violated parole for . . . "basically purse snatching."

2.  No limiting instructions were requested.

3.  The State of West Virginia presented the testimony of an inmate who claimed the Petitioner confessed to the murder.

4.  The defense presented two inmates to rebut the testimony of the State's witness.

5.  There was testimony during the trial that Petitioner lived in the same building with the victim, until the morning her body was found.  He fled before the police arrived.

6.  Both trial counsel testified that they introduced the parole violation as part of their trial strategy.

7.  Petitioner's expert, Gina Stanley, testified that the strategy was not reasonable and that counsel had "other options" to explain the defendant's flight.  She testified that a limiting instruction should have been requested.

(ECF No. 10, Ex. 13 at 3-4 [ECF No. 10-2 at 67]).  The court then made the following conclusions of law:

1.  Courts were not required to give limiting instructions until *State ex rel. Canton v. Sanders*, 601 S.E.2d 75 (2004) made such an instruction mandatory.

2.     Applying the *Strickland* standards, counsel's trial strategy was not unreasonable to explain the flight and the testimony of the inmates.

3.     That the expert's suggestion that the counsel utilize "other options" to explain the flight, seems to suggest that counsel should have "made-up" some other explanation.   That of course would have been improper.

(*Id.* at 4 [ECF No. 10-2 at 67]).

The SCAWV found as follows concerning the petitioner's appeal of the denial of these claims:

[The petitioner] also argues that he was denied his constitutional right to the effective assistance of counsel because counsel told the jury that petitioner was a convicted felon but did not request a limiting instruction. Respondent argues that the actions of counsel complained of by petitioner were intentional, strategic decisions.   In addition, petitioner was specifically questioned by the trial court regarding the introduction of this evidence, and petitioner informed the court that he was in agreement with the introduction of such evidence.

(ECF No. 10, Ex. 15 at 2 [ECF No. 10-2 at 188]).   After referencing the *Strickland* standard, which was adopted by the SCAWV in *State v. Miller*, 459 S.E.2d 114 (W. Va. 1995), the SCAWV found as follows:

In this case, it cannot be said that counsel's performance was deficient under an objective standard of reasonableness or that there is a reasonable probability that the result of proceedings would have been different but for counsel's alleged unprofessional errors.   Further, in reviewing counsel's performance under an objective standard in light of the circumstances, this Court finds that a reasonable lawyer would have acted as defense counsel acted.   Under these standards and the facts of this case, petitioner was not denied his right to the effective assistance of counsel.

(*Id.* at 3).[8]

The petitioner's argument relies heavily upon state evidentiary law concerning when and how evidence of other bad acts may be introduced.   This federal court is

---

[8]   The undersigned notes that the petitioner's habeas appeal was decided <u>after</u> the SCAWV's decision in *Baker.*

bound by the SCAWV's interpretation of state law.  *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983); *Garner v. Louisiana*, 368 U.S. 157, 169 (1961) ("the views of the state's highest court with respect to state law are binding on the federal courts.").   In the instant case, applying the clearly-established *Strickland* standard, the SCAWV found that counsel's strategic decision to introduce the petitioner's criminal history and parole status, in order to combat evidence of flight and to present the context concerning testimony by incarcerated witnesses, without seeking a limiting instruction, was not unreasonable.

The undersigned proposes that the presiding District Judge **FIND** that the state courts' decisions denying the petitioner habeas corpus relief were neither contrary to, nor an unreasonable application of, clearly-established federal law; nor were the decisions unreasonable in light of evidence presented in the state court proceedings. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the respondent is entitled to judgment as a matter of law on Grounds 2(B) and 2(C) of the petitioner's section 2254 petition.

### C.      Grounds 2(D) and 6 – Witnesses dressed in prison garb.

In Ground 2(D) of his section 2254 petition, the petitioner contends that his trial counsel provided ineffective assistance of counsel because they failed to ensure that two defense witnesses, James Pelphrey and Luther Basham, did not appear before the jury in "distinctive prison garb and restraints, and obviously under the supervision of prison officials."  (ECF No. 2 at 8).  In Ground 6 of his petition, the petitioner also asserts that allowing these witnesses to testify in prison garb and restraints violated his right to a fair and impartial jury trial.  (*Id.* at 14-16).

In support of these grounds, the petitioner asserts that the state's witness, Jeffrey Johnson, wore civilian clothes when he testified.  Johnson told the jury that, while he was a prisoner at MOCC, he overheard the petitioner discussing the Sigmon murder, specifically that "he [the petitioner] went up there [to Sigmon's apartment] to get some money," and that "he said he killed her" and "he said he stabbed her in the neck and strangled her with an electrical cord."  (ECF No. 2 at 14-15).  The petitioner contends that Johnson's statements are critical to the State's case in chief.  (*Id.* at 15).  The petitioner further asserts that his attorneys called Pelphrey and Basham to rebut Johnson's testimony, but that his witnesses were required to testify in their prison clothing and were restrained when they took the stand.  (*Id.* at 15).

The petitioner further contends that the United States Supreme Court has determined that the constitutional right to a fair trial prohibits the state from forcing a criminal defendant to appear in prison garb, *Deck v. Missouri*, 544 U.S. 622, 629 (2005); *Estelle v. Williams*, 425 U.S. 501, 503-05 (1976), and that the SCAWV has extended this prohibition to incarcerated individuals testifying as defense witnesses. *Gibson v. McBride*, 663 S.E.2d 648 (W. Va. 2008).  (*Id.* at 16).  According to the petitioner, in *Gibson*, the court determined that "compelling a defendant's incarcerated witnesses to appear in shackles and distinctive prison garb may create sufficient prejudice that reversible error will occur."  (*Id.*)  However, the petitioner acknowledges that the SCAWV has not explicitly stated that compelling a defense witness to testify in shackles and distinctive prison garb is intrinsically prejudicial.  (*Id.*)

The respondent's Memorandum of Law in support of his Motion for Summary Judgment asserts that "[a] criminal defendant has no constitutional right to have his witnesses appear at trial without physical restraints or in civilian attire."  *Gibson*, 663

S.E.2d at 654 (citing Syl. Pt. 3, *State ex rel. McMannis v. Mohn*, 254 S.E.2d 805 (W. Va. 1979), *cert. denied* 464 U.S. 831 (1983)).  The Memorandum of Law further states:

> However, the aforementioned ruling is not absolute; rather, the [SCAWV] makes specific note that, should a Court allow incarcerated witnesses for the State [to] appear in plain clothes, forcing the defendant's incarcerated witnesses to appear shackled and in prison garb would most likely result in reversible error due to the impact on the jury's perceived differences in witness credibility.   *Id.*   This general application of a criminal defendant's constitutional rights has been upheld in the Supreme Court of the United States.  *See Holbrook v. Flynn*, 475 U.S. 560 (1986); *Estelle v. Williams*, 425 U.S. 501 (1976).

> Congruently, the Confrontation Clause of the Sixth Amendment of the United States Constitution provides a criminal defendant with the right to physically face those who testify against him and conduct a meaningful cross-examination, thereby allowing a defendant to question witnesses against him about their present incarceration or past criminal conduct, including relief given to those witnesses by the State in exchange for their testimony.  *See Coy v. Iowa*, 487 U.S. 1012, 1019 (1988).

> Here, Petitioner correctly states that the trial court permitted Jeffrey Dean Johnson to testify in civilian clothing while ruling that incarcerated witnesses for the defense remained in prison garb accompanied by correctional officers.   The Petitioner, however, conveniently omits that Jeffrey Dean Johnson had been release[d] and was on probation [sic; parole?] at the time of Petitioner's trial. Additionally, as part of Mr. Johnson's testimony, he revealed that the substance of his testimony occurred while he was previously incarcerated at [MOCC].  Therefore, not only did Petitioner actively and effectively invoke the constitutional rights afforded him by the Confrontation Clause, but the State did not have to motion the trial court to allow Mr. Johnson to testify in civilian clothes, as he was already on release.

> Therefore, Petitioner was not entitled to have his incarcerated witnesses testify in civilian clothing, was not unfairly prejudiced by Mr. Johnson's appearance in civilian clothing, did not suffer bias on behalf of the trial court, and did not suffer a cognizable constitutional error as alleged in the Amended Petition.

(ECF No. 11 at 26-28).

The petitioner's Response reiterates the factual and legal assertions contained in Ground 6 of his section 2254 petition.  (ECF No. 21 at 20-21).  His Response adds:

The [SCAWV] has determined that "it is within the sound discretion of a trial court to determine whether a defense witness should be required to testify wearing prison attire and or shackles." Syl. Pt. 3, *Allah Jamaal W.*, 209 W. Va. 1, 543 S.E.2d 282 (2000). Allah's attorney had filed a motion with the trial court seeking to have his incarcerated witnesses testify at trial without shackles and wearing civilian clothes. The trial court denied his motion. Petitioner's counsel did not file an appropriate Motion.

In *Allah Jamaal W.*, the [SCAWV] reiterated that a criminal defendant has no constitutional right to have his witnesses appear at trial without physical restraints or in civilian attire. But, the Court also recognized the American Bar Association and other state courts have endorsed the proposition that an incarcerated witness for the defendant should not be compelled to testify before a jury wearing prison attire or restraints.

(*Id.* at 21-22).

The petitioner's Response further asserts that, because the state courts declined to address this issue, summary judgment on this claim is not appropriate. (*Id.* at 21-22).

The Response further states:

Although requiring defense witnesses to wear shackles and prison garb can be [an] intrinsically prejudicial practice that can infringe on a criminal defendant's constitutional right to a fair trial under the 6th Amendment, U.S. Constitution, the state's interest in providing for public safety may justify each practice under certain circumstances; the trial court, under most circumstances, should hold a hearing to determine whether the State's interest in public safety outweighs inherent prejudice of either practice. *Stacy v. Commonwealth* 396 S.W.3d 787 (Ky. 2013). There was no hearing before petitioner's trial began to determine if the State's interest in public safety outweighed the inherent prejudice of requiring two defense witnesses to wear shackles and distinctive prison garb.

Respondent's assertion that "petitioner was not entitled to have his incarcerated witnesses testify in civilian clothing (Respondent's Memo, p. 27) mistakes the clearly established federal law. Compelling incarcerated witness to testify in distinctive prison garb is an intrinsically prejudicial practice and violates a defendant's right to a fair trial when the trial court fails to make an explicit finding that there were sufficient state interests to justify the practice, *Holbrook v. Taylor*, 475 U.S. 560, 106 S. Ct. 1340, 89 L. Ed.2d 525 (U.S., 1986), and, therefore petitioner suffered a cognizable constitutional error.

(*Id.* at 22-23).

As noted in the procedural history above, the state courts summarily denied this claim.[9]  The United States Court of Appeals for the Fourth Circuit has determined that "the phrase 'adjudication on the merits' in § 2254(d) excludes only claims that were not raised in state court, and not claims that were decided in state court, albeit in a summary fashion." *Thomas v. Taylor*, 170 F.3d 466, 475 (4th Cir. 2000).  When a state court summarily rejects a claim without setting forth its reasoning, the federal court reviews the record and the clearly-established Supreme Court law, but still "confine[s] [its] review to whether the court's determination 'resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.'" *Bell v. Jarvis*, 236 F.3d 149, 158 (4th Cir. 2000).

Based upon *Bell*, 236 F.3d at 163, the undersigned proposes that the presiding District Judge **FIND** that the summary refusal of this claim was an adjudication on the merits for purposes of § 2254(d).  Therefore, the undersigned further proposes that the presiding District Judge **FIND** that the appropriate standard of review is an

---

[9]  The SCAWV's decision in the petitioner's habeas appeal addressed this claim as follows:

> This Court notes that it first held that a criminal defendant has no constitutional right to have his witnesses appear at trial without physical restraints or in civilian attire in *State ex rel. McMannis v. Mohn*, 163 W. Va. 129, 254 S.E.2d 805 (1979), *cert. denied*, 464 U.S. 831 (1983).  Although this holding is not absolute, the legal principle announced in *Mohn* has been reaffirmed in both *State v. Allah Jamaal W.*, 209 W. Va. 1, 543 S.E.2d 282 (2000) and *Gibson v. McBride*, 222 W. Va. 194, 663 S.E.2d 648 (2008).  Therefore, this Court declines to revisit its holding in *Mohn*, especially given that petitioner has already had a fair and full opportunity to raise all relevant issues in a prior habeas proceeding.  [Footnote omitted].  The Court concludes that the circuit court did not abuse its discretion in dismissing the petition.

Mem. Decision, *Samples v. Ballard*, No. 13-0833 (Kan. Co. Cir. Ct., Apr. 4, 2014) (docketed as ECF No. 10, Ex. 3 (however, the undersigned notes that page 2 of the Memorandum Decision is missing in the scanned version on CM/ECF).  Thus, the undersigned obtained the full decision from the SCAWV's website.

independent, but deferential, review of the record and the applicable law to determine whether the state court's decision (i.e. the "result") was legally or factually unreasonable. Thus, the undersigned will address the applicable federal precedent and will determine whether the denial of this ground for habeas corpus relief was legally or factually unreasonable.

As appropriately noted by both parties, *Estelle v. Williams*, 425 U.S. 501 (1976), which was clearly-established at the time of the petitioner's trial, found that the constitutional right to a fair trial prohibits the state from forcing a criminal defendant from appearing at trial in distinctive prison clothing.  Although the petitioner relies upon the SCAWV's decision in *Gibson, supra*, to assert that this prohibition has been extended to defense witnesses, the parties both acknowledge that there is no constitutional right to have defense witnesses appear in plain clothes.   *Gibson* was decided ten years after the petitioner's trial.  Moreover, the petitioner has not presented, and the undersigned has been unable to locate, any federal precedent extending the holding in *Estelle* to defense witnesses.  Furthermore, the petitioner's case is clearly distinguishable from *Gibson* in that Jeff Johnson, although incarcerated during the time period that is the subject of his testimony, was on parole and was permitted to be in plain clothes, while the defendants' witnesses were still incarcerated.

Thus, the undersigned proposes that the presiding District Judge **FIND** that, based upon the clearly-established federal law at the time of his trial, the petitioner has failed to demonstrate either that his counsel was unreasonable in failing to object to the two defense witnesses testifying in prison clothing and restraints, or that he was denied a fair trial under those circumstances.  Therefore, the undersigned further proposes that the presiding District Judge **FIND** that the state courts' decisions denying the

petitioner habeas corpus relief were neither legally or factually unreasonable. Accordingly, the undersigned further proposes that the presiding District Judge **FIND** that the respondent is entitled to judgment as a matter of law on Grounds 2(D) and 6 of the petitioner's section 2254 petition.

### D.        Ground 3 – Sufficiency of Indictment.

In Ground 3 of his section 2254 petition, the petitioner contends that his indictment was constitutionally deficient because it did not clearly state the essential elements of felony murder therein.  (ECF No. 2 at 9).  First, the petitioner contends that "the indictment did not give petitioner notice that he was being accused of felony murder."  (*Id.*)  His petition further states:

> The prosecuting attorney eventually gave notice at trial that he would be proceeding on a felony murder theory.  The trial judge instructed the jury on the essential elements of felony murder when he charged the jury on first degree murder, with the underlying felony being robbery and/or burglary.  The trial court also instructed the jury that the offense of robbery and/or burglary "would merge into and become one of the essential elements of felony-murder in the first degree."  (Tr. Vol VIII, 68).

> The failure of the indictment drafted by the prosecuting attorney to include the [sic] an essential element, i.e., that the underlying felony was robbery and/or burglary, is a fatal jurisdictional defect which precluded his trial and conviction for first degree murder.  An indictment for premeditated first degree murder simply does not give a defendant fair notice that he is being charged with the specific offense of first degree murder as the latter involves entirely different elements and facts constituting the offense.

(ECF No. 2 at 10).

The petitioner's section 2254 petition also asserts as follows:

Count Two of the indictment returned by the Grand Jury of Kanawha County, WV alleged petitioner committed an aggravated robbery of the victim by taking of jewelry, stun gun, money and other property from her via an assault and putting her in bodily fear in violation of W. Va. Code § 61-2-12.  In 2000, the W. Va. Legislature enacted a revised statute prescribing penalties for robbery in the first degree and robbery in the

> second degree, W. Va. Code § 61-2-12 (2000, c. 80).  The Felony murder
> statute was last amended in 1991, WV Code 61-2-1 (1991, c. 38).  If the
> 2000 revision of the robbery statute equates the "robbery" in the felony
> murder statute to the "robbery in the first degree" described in W. Va.
> Code § 61-[2]-12(a), then the necessary predicate felony for felony murder
> is absent.

(ECF No. 2 at 9).  The undersigned notes that the homicide of Ms. Sigmon occurred in

1995 and the petitioner was convicted in 1998.  Thus, the 2000 version of the statute is

irrelevant to the petitioner's case.  Accordingly, this argument is meritless.

The respondent's Memorandum of Law addresses petitioner's claim that the

indictment insufficiently charged him with felony murder as follows:

> Petitioner is not deserving of habeas relief merely because the
> indictment did not provide all of the elements of first-degree, felony
> murder.  The Fourth Circuit, in *Hartman v. Lee*, 283 F.3d 190 ([4th Cir.]
> 2002), has held that an indictment is proper so long as a defendant is
> sufficiently informed of the charges against him.  Further the [SCAWV]
> has held that an indictment that does not expressly charge felony murder
> does not preclude the State's prosecuting attorney from asserting a theory
> of felony murder.  Syl. Pt. 1, *State v. Hughes*, 225 W. Va. 218, 691 S.E.2d
> 813 (2010).

> Here, the indictment charges the Petitioner with first-degree
> murder, effectively appraising Petitioner of the charges against him.
> Count One of the indictment charged that Petitioner "feloniously, willfully,
> maliciously, deliberately, premeditatedly and unlawfully did slay, kill and
> murder the victim," while Counts Two and Three charged Petitioner with
> aggravated robbery and nighttime burglary, respectively.  The State merely
> elected to merge the underlying offenses into felony murder, and the trial
> court instructed the jury that the underlying offenses would merge into
> felony murder in the first degree.  (Resp't's Ex. 13).  As such, Petitioner
> was appropriately informed of the charges he faced, a threshold supported
> by the Fourth Circuit in *Hartman*, and this Court must summarily dismiss
> Ground Three (3) of the Amended Petition.

(ECF No. 11 at 23-24).

The petitioner's Response asserts that his indictment only charged him with

premeditated murder and did not give him notice that he was being charged with felony

murder.  (ECF No. 21 at 9).  The Response further asserts that the United States

Supreme Court has unequivocally held that "it is not sufficient to set forth the offense in the words of the statute, unless those words fully, directly and expressly, without any uncertainty, or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished." *Russell v. United States*, 369 U.S. 749, 765, 82 S. Ct. 1038, 1947-48 (1962); *United States v. Carll*, 105 U.S. 611, 612 (1882). (*Id.*) The petitioner further contends that "there must be a factual statement indicating the specific offense charged," quoting the *Russell* opinion as follows:

> Undoubtedly, the language of the statute may be used in general description of an offense, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description with which he is charged.

369 U.S. at 765; 82 S. Ct. at 1048 (citing *United States v. Hess*, 124 U.S. 483, 487, 8 S. Ct. 571, 573 (1888). Accord, *Hamling v. United States*, 418 U.S. 87, 117-18, 94 S. Ct. 2887, 2907-08 (1974). (*Id.*)

> The petitioner's Response further states:

> Petitioner was charged with premeditated murder. The jury was not instructed on two crucial elements: premeditation and deliberation. The jury did not find the elements of premeditation or deliberation. Therefore, every element of the crime alleged in the indictment were not proved. Petitioner was not convicted of the crime alleged in the indictment. *Fiore v. White*, 531 U.S. 225, 228-29 (2001) (due process violated by conviction of defendant without proving each element of crime beyond a reasonable doubt).

(ECF No. 21 at 9-10). The petitioner also appears to argue that the SCAWV and the Fourth Circuit have not specifically addressed the constitutional issue that he is presenting; that is, that the statutory indictment form is insufficient to allege felony murder because "it fails to allege the essential element that the killing occurred during the commission of a specific predicate felony." (*Id.* at 10). His Response further states:

To find petitioner's indictment to be sufficient under federal constitutional law would arguably contradict Syl. Pt. 3 in _SER Cain v. Skeen_, 137 W. Va. 806, 74 S.E.2d 413 (1953) and Syl. Pt. 2, _State v. Stacy_, 181 W. Va. 736, 384 S.E.2d 347 (1989) that all essential elements must be alleged in order for an indictment to be sufficient and identify the specific predicate felony.

It is true that our [federal] appellate court has upheld the constitutionality of the North Carolina's short form indictment only when the State has charged the defendant with first degree murder on theories of premeditation or felony murder. The Court has found that "prosecution on these theories is sufficiently common place that a reasonable defendant charged with common law murder would foresee that he might have to defend against them," _Stroud v. Polk_, 466 F.3d 291, 296-97 (4th Cir. 2006). In the case cited by respondent, the appellate court rejected the argument that first and second degree murder are distinct crimes in North Carolina. _Hartman v. Lee_, 283 F.[3d] 190, 194 (4th Cir. 2002) Petitioner submits that in West Virginia, given the constitutional requirements that an indictment is necessary for all felony prosecutions, Article III, § 14, Constitution, premeditated murder, felony murder predicated on the death of the victim during the commission of a robbery, and felony murder predicated on the death of the victim during the commission of a burglary are three (3) distinct crimes.

(_Id._ at 10-11).

The Circuit Court made the following findings of fact concerning this claim:

1.    Count One of the indictment alleged that Petitioner "feloniously, willfully, maliciously, deliberately, premeditatedly, and unlawfully did slay, kill and murder the victim.   Count Two alleged the statutory offense of aggravated robbery of the victim.   Count Three alleged the statutory offense of a nighttime burglary of the victim's residence.

2.    The State of West Virginia elected, prior to the opening statement, to try the Petitioner under a felony murder theory, based on the underlying offense of aggravated robbery and/or burglary.

3.    The counsel [sic; trial court] instructed the jury on the essential elements of felony murder, with the underlying offenses. The Court instructed the jury that the underlying offenses would merge into felony murder in the first degree.

(ECF No. 10, Ex. 13 at 4 [ECF No. 10-2 at 67]).   The Circuit Court then made the following conclusions of law:

1.     An indictment for murder, which follows the statutory form is proper and the defendant may be convicted thereunder for murder during the commission of a robbery or burglary, which is murder in the first degree.  W. Va. Code 61-2-1, 62-3-15, *Ford v. Coiner*, 196 S.E.2d 91 (1972).

2.     In this case, the proper statutory form charging murder was contained in the indictment.  The defendant was also indicted for the underlying felonies of aggravated robbery and burglary.  The jury was properly instructed on both theories of felony murder and the defendant was notified of the State's theory of felony murder from the beginning of the trial.

(*Id.* at 4-5 [ECF No. 10-2 at 67-68]).

In the petitioner's habeas appeal, the SCAWV found as follows concerning this claim:

Finally, petitioner asserts that the indictment was fatally flawed. Respondent cites to West Virginia Code § 61-2-1 in support of the trial court's finding that petitioner could be convicted of felony murder under the indictment.  As set forth by this Court previously, "An indictment need only meet minimal constitutional standards, and the sufficiency of an indictment is determined by practical rather than technical considerations."  *State v. Hughes*, 225 W. Va. 218, 224, 691 S.E.2d 813, 819 (2010), *quoting* Syl. Pt. 2, in part, *State v. Miller*, 197 W. Va. 588, 476 S.E.2d 535.  Reviewing the sufficiency of the indictment de novo, we find that the indictment was sufficient to sustain petitioner's conviction for felony murder.

(ECF No. 10, Ex. 15 at 3 [ECF No. 10-2 at 189]).

The petitioner's argument is meritless for the same reasons given in this court's prior decision in *Humphrey v. Ballard*, No. 2:08-cr-00879, 2009 WL 2762331, at *6 (S.D. W. Va. Aug. 25, 2009), in which the court found:

[I]n [*State v. Satterfield*, 193 W. Va. 503; 457 S.E.2d 440 (1995)], the SCAWV found that an indictment like Petitioner's was sufficient under West Virginia law.  As repeatedly noted by Respondent, and as found by the state habeas courts, the indictment need not state the underlying felony that forms the basis of felony murder, or the manner in which the deceased died.  The SCAWV's interpretation of the murder statute is conclusive and binding on the federal court.  *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983); *Garner v. Louisiana*, 368 U.S. 157, 169 (1961)

("the views of the state's highest court with respect to state law are binding on the federal courts."); *Faircloth v. Finesod*, 938 F.2d 513, 517 n.9 (4th Cir. 1991) ("This court is bound by the state court's interpretation [of a state statute], and must assume that the statute says what the state court says it says.")

2009 WL 2762331, at *8.  Furthermore, in *State v. Young,* 311 S.E.2d 118, 133-34 (W. Va. 1983), the appellant challenged his felony murder conviction based upon the fact that the indictment did not mention robbery as the underlying offense, but the court held that "it is not necessary under W. Va. Code § 62-1-1, to set forth the manner or means by which the death of the deceased is caused." S*ee also State v. Bragg,* 235 S.E.2d 466 (W. Va. 1977); *State v. Hughes,* 457 S.E.2d 440 (W. Va. 2010).  This federal court is bound by the SCAWV's interpretation of this state law.  *See Estelle v. McGuire*, 502 U.S. 67-68 (1991).

These SCAWV cases are consistent with the clearly-established Supreme Court precedent of *Hamling v. United States*, 418 U.S. 87 (1974), which held that an indictment is constitutionally sufficient when it:  (1) states the elements of the offense; (2) puts a defendant on fair notice of the charge against which he or she must defend; and (3) enables a defendant to assert an acquittal or conviction in order to prevent being placed twice in jeopardy.  (*Id.* at 7-8).

Accordingly, under the clearly-established Supreme Court precedent in *Hamling v. United States*, 418 U.S. 87 (1974), the petitioner's indictment, which substantially followed the language of the state murder statute, was not constitutionally flawed and was sufficient to place the petitioner on fair notice of the charge against him.  Therefore, the undersigned proposes that the presiding District Judge **FIND** that the petitioner has failed to demonstrate that he was denied due process of law or any other constitutional right secured by the United States Constitution based upon the language contained in

the petitioner's indictment.   The undersigned further proposes that the presiding District Judge **FIND** that that the petitioner has not demonstrated that the state courts' decisions denying the petitioner habeas corpus relief on this basis were contrary to, or an unreasonable application of, clearly established federal law, and that the respondent is entitled to judgment as a matter of law on Ground 3 of the petitioner's section 2254 petition.

### E.      Grounds 4 and 5 – Sufficiency of evidence on robbery and burglary and denial of judgment of acquittal.

In Ground 4 of his section 2254 petition, the petitioner asserts that the petitioner was denied due process of law as secured by the 5th and 14th Amendments when the prosecuting attorney failed to prove all elements of robbery and burglary.  In support of this claim the petitioner recites the following evidence presented at trial:

> In April 1995, Ms. Joanna Sigmon moved into Apt. A, 2222 Zable [sic; Zabel] Drive, North Charleston.  Mrs. Samples, petitioner's mother, David Sample[s], petitioner's nephew, and petitioner lived in Apt. C. Sandra (Farrell) Wickline, dropped petitioner off at his apartment at approximately 3:30 a.m., Sunday, August 13.  Around 4:00 a.m., petitioner asked Reba Butler to take him downtown to buy drugs.  Ms. Butler refused this request.

> The state eventually committed itself to placing the time of Ms. Sigmon's death between 6:30 a.m. and 9:00 a.m.  Initially, in his autopsy report, Dr. Sopher, the state medical examiner, affixed the time of Ms. Sigmon's death at 5:00 a.m., Sunday, August 13, 1995.  Mr. Kenny "Tweety" Smith testified that Ms. Sigmon was present in "Tweety's" as late as 6:00 a.m., Sunday, August 13, 1995, and it would take her 20 to 30 minutes to travel to her apartment.  Mr. Smith placed a call to Ms. Sigmon at 6:06 a.m.  Petitioner's mother testified she saw her son at 8:50 a.m.

> The state's theory was that petitioner committed a homicide during the commission of a robbery.  An essential element of robbery [is] taking of property from the immediate person of the victim with the intent of permanently depriving the victim of her property.  There was unassailable testimony that the jewelry alleged to have been stolen from Ms. Sigmon, the homicide victim, by petitioner belonged to Melissa A. Bays.  Petitioner was in possession of a stun gun as early as Saturday, this fact makes it

impossible for petitioner to be in possession of the stun gun which was given to Ms. Sigmon as late as Sunday morning. Petitioner denied being in Ms. Sigmon's apartment on Sunday morning, the prosecuting attorney produced no tangible evidence to prove the contrary.

The state's alternative theory was the petitioner committed a homicide during the commission of a burglary. The state did not produce evidence to support their assertion that petitioner had the keys to Ms. Sigmon's apartment. The petitioner's mother testified that once the decision to open the victim's apartment was made on Monday, she opened the door with the landlady's keys. In order to open the door, she had to turn the deadbolt knob placed on the victim's door several months earlier.

The state did not produce evidence that there was fresh breaking into her apartment. There was evidence that at some point in the past someone had tampered with the door to Ms. Sigmon's apartment but the State's witness admitted the damage could have occurred weeks or months before the victim's death on August 13, 1995.

(ECF No. 2 at 11).

In Ground 5 of his section 2254 petition, the petitioner contends that his right to due process was denied by the trial court's denial of his Motion for Judgment of Acquittal at the conclusion of the State's case-in-chief. His petition asserts that the State failed to conclusively establish the time of Sigmon's death and failed to conclusively present a murder weapon. Concerning the knife that the petitioner had given to his great aunt, which the State purported to be the murder weapon, the petitioner states:

At trial, the State introduced a knife apparently capable of inflicting the wounds consistent with the wounds responsible for Ms. Sigmon's death. However, the fatal wounds sustained b[y] the victim could have been produced by a variety of weapons. The state failed to refute petitioner's testimony that he routinely brought knives to the home of his great-aunt in Hurricane. Ms. Hughes, petitioner's great-aunt, testified that the [sic] she remembered the knife as being "dirty" as if the knife was used in some form of auto-mechanic work, but not bloody or caked with evidence of bodily fluids, or particles of human skin or flesh. The petitioner's expert demonstrated that even the most careful cleaning of the knife would not have prevented the knife being carefully tested for the present [sic; [presence] of [the] victim's DNA. The State of West Virginia did not perform an[y] forensic testing of the knife.

(ECF No. 2 at 12-13).  The petitioner further contends that the State failed to offer sufficient evidence that there was a robbery:

> In the absence of sufficient reliable evidence of all element[s] of the predicate felony of robbery, there can be no conviction for felony murder during the commission of a robbery.  Robbery, at common law, is defined as the felonious taking of money or goods of value from the person of another or in her presence, against her will, by force or by putting her in fear.  In this case, the fruits of the robbery were allegedly a necklace and a stun gun.
>
> First, the State failed to demonstrate Ms. Sigmon owned the necklace that was pawned after her death or that the pawned jewelry was the necklace allegedly stolen from Ms. Sigmon.  On Monday, August 14, 1995, petitioner gave his sister, Karen Wickline, and his girlfriend, Sandra (Farrell) Wickline, certain pieces of jewelry.  They subsequently pawned the jewelry at N & M Gold and Pawn Shop.  Melissa Ann Bays, a former resident of the apartment building where petitioner lived, testified that she had given the petitioner the jewelry that was pawned.  The prosecuting attorney clearly badgered Ms. Bays regarding the identity of the necklace. Second, the State did not establish the petitioner possessed the stun gun that Ms. Sigmon was given on Sunday morning after she was threatened by her rivals for her boyfriend's affections.  The State did not establish that the stun gun produced at trial was the same stun gun given to Ms. Sigmon early Sunday morning.  In the absence of reliable and sufficient proof the "goods of value" were owned by Ms. Sigmon and taken from her immediate presence there can be no conviction for robbery.

(ECF No. 2 at 12-13).  The petitioner also contends that there was insufficient evidence of a burglary:

> In 1995, in order to prove the commission of the offense of nighttime burglary, the State of West Virginia had to overcome the presumption of innocence and prove, beyond a reasonable doubt, each of the following elements: 1) Petitioner, 2) on August 13, 1995, 3) in Kanawha County, W. Va., 4) during the nighttime, 5) did feloniously and burglariously a) break and enter, 6) a dwelling house, 7) belonging to Joanna Sigmon, 8) with the intent to commit a crime.
>
> The State failed to offer any conclusive evidence as to forced entry into the [sic] Ms. Joanna Sigmon's apartment by petitioner immediately prior to her death (Element 1).  The State's evidence only established that at some point in the past someone had tampered with the door to Ms. Sigmon's apartment.  The State's witness conceded the damage could have occurred weeks or months before the victim's death on August 13, 1995.

> The State failed to put forth any forensic evidence establishing petitioner's presence in Ms. Sigmon's apartment immediately before her death (Elements 1, 5 , 8).  In the absence of adequate and sufficient evidence of petitioner effected  entry of the deceased's apartment by force there can be no conviction for burglary and no conviction for felony murder predicated on the commission of a burglary.

(*Id.* at 13-14).

The petitioner also claims that the unanimity of the jury may be in doubt because some jurors may have believed that the predicate felony for felony murder was aggravated robbery, while others might have found the predicate felony to be burglary. (*Id.* at 14).  The court can summarily dispense with this argument because the jury was presented with seven alternative verdicts, including one finding that the predicate offense was aggravated robbery, one finding that the predicate offense was burglary, and one finding that the murder occurred in the course of both felonies.  The jury's verdict reflects their unanimous verdict that the murder occurred during the commission of both felonies.  (ECF No. 10, Ex. 5).  Thus, this last argument lacks merit.

The respondent's Memorandum of Law in support of his Motion for Summary Judgment addressed Ground 4 as follows:

> Here, Petitioner asserts that, regardless of the findings of a jury following the conclusion of both the State's and Petitioner's respective cases and after hearing all of the evidence submitted therein, the trial court erred in allowing his conviction to stand.  In support of this assertion, Petitioner has supplied the Court with the testimony of his mother.  Petitioner has not, however, supplied any indication that the jury's findings in support of a conviction for robbery or burglary were erroneous or unreasonable.  Rather, Petitioner has merely indicated that the facts, according to his defense, absolve him of any wrongdoing.  The jury, as the trier of fact, after considering the evidence and witness credibility, found otherwise.  As such, Petitioner merely contends a question of fact and has failed to provide sufficient evidence that calls into question the reasonableness of the jury's verdict or an application thereof that runs contrary to Federal law.  Therefore this Court must summarily dismiss Ground Four (4) of the Amended Petition.

(ECF No. 11 at 24).  The Memorandum of Law also addressed Ground 5 as follows:

> During the trial, the jury was shown evidence that Petitioner was in possession of a stun gun and jewelry that were previously in the possession of the victim.  The stun gun was never recovered, but the jewelry was discovered to have been sold to a pawn shop in the area by Petitioner's girlfriend and his sister.  The jury also weighed evidence of pry marks on the victim's door, which appeared to be fresh.  [FN 4]  Further evidence revealed at trial indicated that Petitioner's DNA was found at the scene on one cigarette butt in an ashtray on the victim's coffee table.  The jury also saw evidence of a knife seized from Petitioner's aunt's home that Petitioner had given to his aunt to wash, the blade of which was consistent with the stab wounds on the victim's neck.  Finally, the jury heard the testimony of witness Jeff Johnson, who revealed that Petitioner informed him of killing the victim by stabbing her "in the neck" and strangling her with an electrical cord," to ransack her apartment and obtain money for cocaine.  Petitioner had the opportunity to effectively cross Mr. Johnson.

> [FN 4 – Petitioner questionably defends against this evidence by indicating that the pry marks could be several weeks old, and that he could have just obtained a key to the victim's door from his mother.]

> Petitioner bolstered his own defense by indicating that [he] didn't need to break into the victim's home, as his mother had a key, having family and other prisoners testify in his defense, attempting to prove that the jewelry was not the victim's, despite numerous witnesses indicating otherwise, and confining the time-frame for the crime to a small window that would make it difficult, but not impossible to commit the crime.

> In sum, the jury weighed substantial evidence throughout the trial, including strong evidence of the Petitioner's guilt, and Petitioner had ample opportunities to offer evidence in his defense, although ultimately, he was unable to do so.  As a result, the jury reasonably found him guilty and the trial court reasonably denied Petitioner's motion for acquittal to set aside that conviction.  (Resp't's Ex. 20).  Therefore, this Court must summarily dismiss Ground Five (5) of the Amended Petition.

(ECF No. 11 at 25-26).

The petitioner's counsel, Matthew Victor, moved for a judgment of acquittal at the conclusion of the State's case-in-chief.[10]   Mr. Victor argued that there was no

---

[10]      In actuality, the trial court permitted Mr. Victor to make the motion for judgment of acquittal during the lunch break on January 14, 1998.  By that time, the defense had already presented the testimony of the petitioner's mother, Ellen Samples and Melissa Ann Bays.  (ECF No. 10, Ex. 26 at 66-110).  Being apparently dissatisfied with the time that Mr. Victor took to make the initial motion, the trial

evidence of felony murder based upon robbery because there was no evidence of a taking by force or intimidation (which the trial court modified to "violence or threats of violence").  (ECF No. 10, Ex. 26 at 252).  Mr. Victor further asserted that there was no evidence to support a finding of felony murder based upon a burglary because there was no definitive evidence of forced entry or entry without breaking, but without consent (*i.e.,* a "trespasser entry").  (*Id.* at 253-55).  Mr. Victor also argued that there was no evidence to definitively link the jewelry to the victim.  (*Id.* at 256-258).  Mr. Victor also argued that the testimony of Jeff Johnson and Sandra Farrell Wickline concerning the petitioner' alleged admissions about the crime should be excluded as being so inherently incredible that it should be disregarded.  (*Id.* at 259-60).

The trial court noted that, at that stage, he could not disregard testimony and, in fact, must take all of the evidence presented in the light most favorable to the State.  (*Id.* at 260).  The court ultimately made the following findings:

> Obviously this is a circumstantial evidence case, that there is no eyewitness to the commission of this offense in its entirety or any element of this offense.
>
> It's totally circumstantial, and each of the circumstances, taken alone, I understand your point.  But when you take all the circumstances together, all of them.  That is the testimony of the various witnesses, as well as the physical items of evidence, I think the jury could find beyond a reasonable doubt that those circumstances point to your client as the perpetrator of the killing of the victim, Joanna Sigmon. . . . The issues you have brought to me are issues of credibility to be resolved by the jury, not me.  Such as the believability of the witnesses and the weight of the testimony.

(*Id.* at 262).  When Mr. Victor further argued that there was no evidence of robbery, the trial court stated that "the State has made a prima facie case of all the charges in the indictment . . . ."  (*Id.* at 263).  He then made the following specific findings:

court again delayed the argument on the motion for judgment of acquittal until the end of that day, after the jury had left for the evening.  (ECF No. 10, Ex. 26 at 251-267).

But that is based upon the evidence as it existed when the State rested its case. I take into consideration only the State's evidence to that point in time, not any of the evidence that has been presented by you. When you rest your case, or when all the evidence is introduced, then you can make another motion of a similar basis, upon which then I take into consideration your evidence. But as an example, the jury, in this case, could find or believe that this lady when she came home and went into her apartment, that somebody was already there. They could find or believe that it was your client, I think, under the evidence. They could also believe that when she came in, she went to the kitchen, put her purse or if she had it with her behind that toaster, got two Tylenol sinus tablets out, started back to the bedroom where your client was, and was set upon by your client with either this boot lace or the appliance cord or whatever, and in the process of this, before she even takes the Tylenol sinus pill, one of them drops down her dress. That's how it got down in there where the coroner or medical examiner said he found between the waistband of her underwear and her body. And a struggle took place, where her fingernail was broke, where she dropped - - isn't there evidence in the case that the other Tylenol was found on the carpet in there?

\* \* \*

In the bedroom. That's what I recollect, and that in a struggle on the bed, that's how the bed got broke, and she was wrestled to the bed and killed, and that your client was in the process of burglarizing her apartment looking for money.

\* \* \*

But when she came home, it became much more than a burglary perhaps. Then it became a robbery of the person, taking something by force and violence from her. I don't know. We'll sort that out in the instructions, but I think the jury could find that beyond a reasonable doubt that that's what occurred or a theory, a theory. Now, whether that is a possible theory or not, I don't know, but just me sitting up here listening to the evidence and what it shows and what it doesn't show. Anyway, okay.

(*Id.* at 263-66).

When Mr. Victor continued to vigorously assert that the State could not prove this "theory," the trial court concluded by finding as follows:

Maybe I'm wrong. I don't know what their theory is or what they are going to argue. I'm just saying what I saw. You said there's no evidence of all these crimes, Mr. Victor. I'm saying, as I view the evidence, I just told you how the jury, I think, could find, and they could believe that your client

because of the cigarette butt, because of the jewelry, and a host of other separate independent circumstantial facts coupled together point to your client, as opposed to them girls, whoever they were, having that spat in the village or whatever, that bar earlier.

(*Id.* at 266-67).

The petitioner, by his counsel, also filed a post-trial Motion for Acquittal and for a New Trial, which was argued at the petitioner's sentencing hearing on February 6, 1998. (ECF No. 10, Ex. 29).   During the argument of the motion, Mr. Victor contended as follows:

Your Honor, to be consistent with the position that the defendant took at trial, and primarily at the conclusion of the State's case and at the conclusion of the entire evidence adduced before the jury, we argued that no reasonable trier of fact could have found the defendant guilty of the felony murder and both aggravated robbery and burglary inasmuch as it was our position then, and it is our position now, that the State failed to prove any elements of aggravated robbery of a stun gun and jewelry, and that is the items alleged in the indictment.

Once more, we do believe that this Court erred in denying a Motion for Acquittal inasmuch as the State failed to establish the time of the victim's death, present the stabbing murder weapon, no forensic evidence produced linking Mr. Samples to the victim's apartment at the time of the alleged offense, and no - - well, no conclusive evidence of forced entry was offered or that the defendant possessed a key to the victim's apartment.

The State did not demonstrate the victim's ownership of the necklace and basically a stun gun was abandoned as one of the items that my client allegedly robbed Ms. Sigmon of.

Moreover, we believed then and we believe now that the testimony of at least two people:  Ms. Ferrell and Mr. Johnson, was incredible and should have been disregarded and again, the State failed to prove any elements of an aggravated robbery.

Also, the same would be reinforced - - the same arguments would be reinforced at the end of the entire events of the case, and overall, even in the light most favorable to the prosecution, no reasonable trier of fact could have found the defendant guilty of the felony murder because of the insufficient evidence.

(ECF No. 10, Ex. 29 at 4-5 [ECF No. 10-10 at 31-32]).  The trial court upheld his prior rulings and found that the jury's verdict was not inconsistent with the evidence and that the evidence supported the verdict.  (*Id.* at 9 [ECF No. 10-10 at 36]).

The petitioner again challenged the denial of his motion for judgment of acquittal and the sufficiency of the evidence to support his conviction in his direct appeal.  (ECF No. 10, Ex. 7).  The Petition for Appeal essentially argued that "[a]t best, the [State's] theory would support the finding of guilty of felony murder with the underlying offense of burglary, if the State could present the evidence of the Petitioner burglarizing the victim's apartment.  But certainly, this scenario fails to produce any elements of aggravated robbery."  (*Id.* at 16-17 [ECF No. 10-1 at 85-86]).  The petition goes on to argue that the State's presentation of the evidence demonstrated, at most, that the assailant strangled and stabbed Sigmon before taking her jewelry and stun gun and, thus, there was no evidence of taking the property from the person of the victim by violence or threat of violence that was contemporaneous with the taking.  (*Id.* at 17-19). Such evidence, the petitioner argued, could not support a finding of a robbery.  (*Id.*) Moreover, the petitioner's Petition for Appeal asserted that the evidence certainly could not support a finding that the murder was predicated on <u>both</u> robbery and burglary, which is precisely what the jury found.  (*Id.* at 17-18).

The petitioner's Petition for Appeal also attempted to establish that the State could not prove the aggravated robbery charge because (1) there was "unassailable" evidence that the jewelry in question belonged to Melissa Ann Bays; (2) the petitioner was in possession of a stun gun as early as Saturday, making it impossible for him to have possession of Sigmon's stun gun, which wasn't given to her until the early hours of Sunday morning; and (3) the petitioner emphatically denied being in Sigmon's

apartment on Sunday morning and the State has not produced definitive evidence to prove otherwise. (*Id.* at 20). The petitioner further asserted that the only evidence definitively linking him to Sigmon's apartment was the cigarette butt, which the State could not prove was placed there on Sunday morning. (*Id.* at 21). Nor could the State definitively state that the knife that the petitioner gave to his great aunt was the murder weapon. The petitioner asserted that, at best, the State's evidence was "inconclusive" and was not sufficient to find his guilt beyond a reasonable doubt. (*Id.* at 21-25). The SCAWV summarily refused the petitioner's direct appeal. (*Id.* at 1 [ECF No. 10-1 at 65]).

As noted by the petitioner in his Response, the Due Process Clause requires that the prosecutor prove beyond a reasonable doubt every element of the crime with which a defendant is charged. *See, e.g., In re Winship*, 397 U.S. 358, 364 (1970); *Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993). Furthermore, the United States Supreme Court has held that evidence is sufficient to support a criminal conviction when, "in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v.* Virginia, 443 U.S. 307, 319 (1979). It is under this clearly-established precedent that the Grounds 4 and 5 of the petitioner's section 2254 petition must be analyzed.

West Virginia's robbery statute, W. Va. Code § 61-2-12, codified the common law definition of robbery, which is "the felonious taking of money or goods of value from the person of another or in his presence, against his will, by force or putting him in fear." *See Vandal v. Adams*, 115 S.E.2d 489 (W. Va. 1960); *Young v. Boles,* 343 F.2d 136 (4th Cir. 1965). Thus, the State was required to prove that the petitioner took money or goods of value from the person of Joanna Sigmon, or in her presence, against her will by

some form of violence, or threat of violence causing her to be put in fear, as enumerated in the robbery statute at that time.

The petitioner's Response asserts that Mr. Victor raised the insufficiency of evidence claim in his direct appeal, stating as follows:

> (A) review of . . . case law will demonstrate the fallacy of the jury's conclusion that the Petitioner was guilty of felony murder based upon the finding that the Petitioner was in the process of committing a robbery . . . . And although there is no statutory definition of robbery *per se*, the taking of some property from another person must be done contemporaneously with the use of force or a . . . weapon.  *Williams v. Kelly*, 816 F.2d 939 (4th Cir. 1987) (*State v. Samples*, Petition for Appeal, 06-02-98, p.16).

(ECF No. 21 at 14).  The petitioner then attempts to analogize his case to that of the petitioners in *Williams v. Kelly, supra*, and *Smith v.* Cox, 435 F.2d 453, 456-457 (4th Cir. 1970), both Virginia cases.  (*Id.* at 14-15).  The petitioner asserts that these cases demonstrate that, to prove a robbery, the taking of property must be preceded by or contemporaneous with violence or intimidation of a living victim; otherwise, the facts would only support a larceny.  (*Id.* at 15).

The petitioner's Response also reiterates his position that the State did not sufficiently prove that the petitioner "did feloniously *break and enter*" Sigmon's apartment "*with the intent to commit a crime*," and emphasizes that the indictment did not specify the crime that the petitioner intended to commit.  (*Id.* at 16-17).

Finally, the petitioner's Response contends that the general verdict found by the jury that the murder occurred in the course of an aggravated robbery <u>and</u> a burglary is an alternative basis to vacate his conviction.  His Response states, "[a] conviction based on a general verdict is subject to challenge if the jury was instructed on alternative theories of guilty and may have relied on an invalid one."  *Hedgpeth v. Pulido*, 555 U.S.

57, 58, 129 S. Ct. 530, 172 L. Ed.2d 388 (2008); _Stromberg v. California_, 283 U.S. 359, 51 S. Ct. 532, 75 L. Ed 1117 (1931).  (ECF No. 21 at 17-18).

First, the undersigned does not believe the jury's verdict in the instant case to be a "general verdict."  Rather, having been given the options of finding one or the other underlying felonies as the predicate offense for felony murder, the jury unanimously found that the petitioner committed both a burglary and an aggravated robbery. Moreover, the petitioner's argument in this regard appears to be foreclosed by the Supreme Court's holding in _Griffin v. United States_, 502 U.S. 46 (1991), as further addressed by the SCAWV in _State v. Berry_, 707 S.E.2d 831, 837-839 (W. Va. 2011) (a general verdict is valid even where a charge is prosecuted under two theories of liability if there is sufficient evidence to support either theory).

The petitioner has advanced several claims concerning the sufficiency of the indictment and the evidence presented by the State for his conviction for felony murder based upon aggravated robbery and burglary.  However, the petitioner's felony murder conviction was upheld on appeal, after he specifically raised these same claims of error. The SCAWV found no error in the trial court's handling of either the legal or factual issues concerning the sufficiency of evidence and the denial of the petitioner's motion for judgment of acquittal.

Many of the petitioner's arguments address the credibility of witnesses and the weight that should be given to contradictory, and largely circumstantial, evidence.  As noted by the trial court in denying the petitioner's motions for judgment of acquittal, those are jury issues.  In this matter, the jury, after being properly instructed by the trial court on the applicable law, considered all of the evidence and unanimously found,

beyond a reasonable doubt, that the petitioner killed Joanna Sigmon in the course of committing both a burglary and aggravated robbery.

Based upon an exhaustive review of the trial transcripts, the undersigned proposes that the presiding District Judge **FIND**, pursuant to the clearly-established federal precedent in *Jackson v. Virginia*, 443 U.S. at 319, that, in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of both aggravated robbery and burglary beyond a reasonable doubt.

Accordingly, the undersigned proposes that the presiding District Judge **FIND** that the petitioner has not demonstrated that his conviction for felony murder based upon aggravated robbery and burglary, violated his due process rights.   Therefore, the undersigned further proposes that the presiding District Judge **FIND** that that the petitioner has not demonstrated that the state court's decision denying the petitioner relief on this basis was either contrary to, or an unreasonable application of, clearly established federal law, or unreasonable in light of the evidence presented in the state court proceedings, and, thus, the respondent is entitled to judgment as a matter of law on Grounds 4 and 5 of the petitioner's section 2254 petition.

### F.    Ground 7 – Cumulative error.

In Ground 7 of his section 2254 petition, the petitioner contends that he "was denied a fair and impartial trial due to cumulative errors of trial counsel, the prosecuting attorney, and the trial court."   (ECF No. 2 at 17).   The petitioner then incorporates by reference Grounds 1 through 6 of his section 2254 petition.   (*Id.*)   He does not further elaborate on this claim.

The respondent's Memorandum of Law in support of his Motion for Summary Judgment asserts that the petitioner has not proven any cognizable errors in this matter and, thus, there is no basis for a cumulative error claim.  (ECF No. 11 at 28).

The petitioner's Response further addresses his cumulative error claim as follows:

> Because due process and other federal constitutional rules regulate the form and substances of the procedures that the State of West Virginia may use in her trial, sentencing and appellate practices and procedures, the accumulation of these and other kinds of errors that individually did not, but collectively may, make petitioner's trial fundamentally unfair. "The Supreme Court has clearly established that the combined effect of multiple trial errors violates due process whether it renders the resulting trial fundamentally unfair. *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973).  The combined prejudice of multiple errors deprived petitioner of a fundamentally fair trial and constitutes a separate and independent basis for granting the petition.  *See Alcala v. Woodford*, 334 F.3d 862, 882-83 (9th Cir. 2003).   "The cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error."  *Darks v. Mullin*, 327 F.3d 1001, 1018 (10th Cir.), *cert. denied*, 540 U.S. 968 (2003) [Footnote containing other citations omitted].

(ECF No. 21 at 23).  The petitioner also asserts that his cumulative error claim is not subject to the standard of review under 28 U.S.C. § 2254(d)(1) because there is no antecedent state court decision.  (*Id.* at 23-24).

In *Fisher v. Angeleone*, 163 F.3d 835, 852 (4th Cir. 1998), the Fourth Circuit held that "legitimate cumulative-error analysis evaluates only the effect of matters <u>actually determined to be constitutional error</u> . . . ." [Emphasis added].  Thus, in order for a cumulative error analysis to apply, the court must first find that there have been actual constitutional errors.

The petitioner's claim of cumulative error stems from claims which the court has previously found to be non-errors.  Because the court has already found that there were

no violations of the petitioner's constitutional rights, to the extent that the petitioner raises (as a basis for cumulative error) claims already addressed by the court, his claim of cumulative error lack merit as well.

The undersigned proposes that the presiding District Judge **FIND** that the petitioner was not denied a fair and impartial trial based on the cumulative effect of any alleged errors asserted by him in his federal petition, and that the state courts' decisions denying the petitioner post-conviction relief were not legally or factually unreasonable. Therefore, the undersigned further proposes that the presiding District Judge **FIND** that the respondent is entitled to judgment as a matter of law on Ground 7 of the petitioner's section 2254 petition.

## **RECOMMENDATION**

For the reasons stated herein, it is respectfully **RECOMMENDED** that the presiding District Judge **GRANT** the respondent's Motion for Summary Judgment (ECF No. 10), **DENY** the petitioner's Motion for Partial Summary Judgment (ECF No. 19), and dismiss this matter from the docket of the court.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (service/mailing) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made,

and the basis of such objection.  Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the district court and a waiver of appellate review by the circuit court of appeals.  *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce,* 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on Judge Johnston.

The Clerk is directed to file this Proposed Findings and Recommendation, to mail a copy of the same to Petitioner, and to transmit it to counsel of record.

 February 6, 2015

Dwane L. Tinsley
United States Magistrate Judge