# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

## CHARLESTON DIVISION

JAMES TIMOTHY SAMPLES,

               Petitioner,

v.                                      CIVIL ACTION NO.   2:14-cv-15413

DAVID BALLARD,
        Warden, Mount Olive Correctional Facility,

               Respondent.


## MEMORANDUM OPINION AND ORDER

Pending before the Court are Respondent's Motion for Summary Judgment (ECF No. 10) and Petitioner's Motion for Partial Summary Judgment (ECF No. 19) on Petitioner's 28 U.S.C. § 2254 Petition for Writ of Habeas Corpus ("the § 2254 Petition").   This matter was referred to United States Magistrate Judge Dwane L. Tinsley for submission of proposed findings and a recommendation for disposition ("PF&R").   On February 25, 2015, Magistrate Judge Tinsley submitted a PF&R (ECF No. 25) recommending the Court grant Respondent's motion for summary judgment and deny Petitioner's motion for partial summary judgment.   Petitioner filed objections to the PF&R on March 10, 2015 (ECF No. 29), which were timely pursuant to an extension granted by the Court (ECF No. 28).   For the reasons that follow, the Court **OVERRULES** Petitioner's objections and **DISMISSES** the § 2254 Petition.

## *I. BACKGROUND*

On January 16, 1998, Petitioner was convicted upon a jury verdict of felony murder in the first degree in the commission of aggravated robbery and burglary. Thereafter, the trial court sentenced Petitioner to life in prison with no recommendation of mercy.

The complete factual and procedural history of Petitioner's direct appeal and various collateral appeals in the state courts, as well as a review of Petitioner's claims in his federal habeas petition, are set forth in detail in the PF&R and need not be repeated here. The PF&R also contains a thorough summary of the evidence submitted at Petitioner's trial. A discussion of that evidence, as necessary to resolve his objections, is also set forth in Section III.E of this Opinion. The PF&R recommends that this Court grant Respondent's motion for summary judgment (ECF No. 10), deny Petitioner's motion for partial summary judgment (ECF No. 19), and dismiss this matter from the Court's docket.

## *II. LEGAL STANDARDS*

### *A. Review of Magistrate Judge's Findings and Recommendations*

Pursuant to Rule 72(b)(3) of the Federal Rules of Civil Procedure, the Court must determine *de novo* any part of a magistrate judge's disposition to which a proper objection has been made. The Court is not required to review, under a *de novo* or any other standard, the factual or legal conclusions of the magistrate judge as to those portions of the findings or recommendation to which no objections are addressed. *Thomas v. Arn*, 474 U.S. 140, 150 (1985). Failure to file timely objections constitutes a waiver of *de novo* review and the Petitioner's right to appeal this Court's Order. 28 U.S.C. § 636(b)(1); *see also Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984). In addition, this Court

need not conduct a *de novo* review when a party "makes general and conclusory objections that do not direct the Court to a specific error in the magistrate's proposed findings and recommendations." *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982).

### B. Habeas Corpus Standard of Review

A federal court may grant habeas relief for a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "Therefore, when a petitioner's claim rests solely upon an interpretation of state case law and statutes, it is not cognizable on federal habeas review." *Weeks v. Angelone*, 176 F.3d 249, 262 (4th Cir. 1999).

Section 2254(d), as modified by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides for a deferential standard of review to be applied to any claim that was "adjudicated on the merits" in state court proceedings. In such a case, a federal court may grant habeas relief only if the adjudication of the claim in state court

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Section 2254(d)(1) describes the standard of review to be applied to claims challenging how the state courts applied federal law. "A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in [Supreme Court] cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). "The court may grant relief

under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case." *Id.*   The latter inquiry focuses on whether the state court's application of clearly established federal law was "unreasonable," as distinguished from whether it was "correct."   *See Renico v. Lett*, 559 U.S. 766, 773 (2010); *Bell*, 535 U.S. at 694; *Williams v. Taylor*, 529 U.S. 362, 410 (2000).

Section 2254(d)(2) describes the standard to be applied to claims challenging how the state courts determined the facts.   "[A] determination of a factual issue made by a State court [is] presumed to be correct," and the petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence."   28 U.S.C. § 2254(e)(1).   "The phrase 'adjudication on the merits' in section 2254(d) excludes only claims that were not raised in state court, and not claims that were decided in state court, albeit in a summary fashion."   *Thomas v. Taylor*, 170 F.3d 466, 475 (4th Cir. 1999).   *See also Harrington v. Richter*, 562 U.S. 86, 98 (2011) (section 2254(d) applies even if the state court issued a summary decision unaccompanied by an explanation).

### C. Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. That rule provides, in relevant part, that summary judgment should be granted if "there is no genuine issue as to any material fact."   Summary judgment is inappropriate, however, if there exist factual issues that reasonably may be resolved in favor of either party.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).   "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party."   *The News & Observer Publ. Co. v. Raleigh–Durham Airport*

*Auth.*, 597 F.3d 570, 576 (4th Cir. 2010).   When construing such factual issues, the Court must view the evidence "in the light most favorable to the [party opposing summary judgment]." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970).

## III. DISCUSSION

Initially, the Court observes that Petitioner's *pro se* filing detailing his objections to the PF&R principally recites facts and legal standards while noting that he "specifically objects" to certain findings.   To the extent that it is possible to discern specific arguments or assertions of error beyond such general and conclusory "specific objections," the Court has endeavored to afford Petitioner's arguments liberal construction.

### A.   Failure to Conduct **Voir Dire** *Regarding the Ability to Recommend Mercy (Habeas Petition Grounds 1 and 2(A))*

First, Petitioner objects to the PF&R's conclusion that Respondent is entitled to summary judgment as to Grounds 1 and 2(A) of Petitioner's § 2254 petition.   (ECF No. 29 at 1–8.)

In Ground 1, Petitioner argues that he was denied a fair trial when his trial counsel failed to inquire on *voir dire* whether prospective jurors would be willing to consider recommending mercy[1] if Petitioner were to be found guilty when two members of the petit jury subsequently acknowledged in answer to post-verdict questionnaires sent by Petitioner's habeas counsel that

---

[1]  W. Va. Code § 62-3-15 provides that a person convicted of first degree murder is not eligible for parole, but provides that "the jury may, in their discretion, recommend mercy, and if such recommendation is added to their verdict, such person shall be eligible for parole in accordance with the provisions of [Chapter 62, Article 12 of the Code], except that, notwithstanding any other provision of this code to the contrary, such person shall not be eligible for parole until he or she has served fifteen years."   "A defendant charged with murder of the first degree is entitled to question potential jurors on *voir dire* to determine whether any of them are unalterably opposed to making a recommendation of mercy in any circumstances in which a verdict of guilt is returned."   Syl. Pt. 7, *State v. Williams*, 305 S.E.2d 251, 255 (W. Va. 1983).

they would not consider mercy as an option in a first-degree murder case.[2]   (ECF No. 2 at 5–7.)

In Ground 2(A), Petitioner argues that his trial counsel provided ineffective assistance of counsel

---

[2] Jurors Kimbra Clinton and David Bower were sent a questionnaire stating the following:

> The sentence for first degree murder in West Virginia is life in prison.   If the defendant is convicted of first degree murder, the jury must decide whether or not to recommend mercy. If the jury does not recommend mercy, the defendant is sentenced to life in the state penitentiary without the possibility of parole.   If the jury recommends mercy, the defendant is sentenced to life in the state penitentiary but is eligible for parole after serving fifteen years.   You sat on the jury that found James Timothy Samples guilty of first degree murder and did not recommend mercy.   If you had been questioned before the trial on your willingness to consider mercy in a first degree murder case, what would you have said? ____ Yes ____ No.   Please explain:

(Jury Questionnaire, Ex. 4 to Clinton Dep., ECF No. 19-1 at 20.)
Clinton marked "No" and wrote on the questionnaire the following:   "If conviction is for 1st degree murder I would not recommend mercy."   (*Id.*)   Clinton was subsequently deposed in connection with the questionnaire.   When asked if she would have a hard time putting herself back in the position she was in before learning the evidence in the trial, she replied "Yes, because, well, I'm tainted at this point. Because I've heard the case and I feel he gave the girl no mercy."   (Clinton Dep. at 10:1-3.)   About her decision not to grant mercy, she testified that she "did exactly what he did, I took his life into my hands, and I had to make a decision on whether, you know, it was horrible."   (*Id.* at 10:17-19.)   When asked if, she had been asked whether she would consider mercy after being told about the circumstances of the alleged murder, she responded, "Probably not.   I would not recommend mercy.   But that's not the typical thing.   But, no, because he showed no mercy to the victim, that's what he deserves, no mercy."   (*Id.* at 14:5-7.)   Asked if she was saying that her answer really depends on the facts and on whether the case had been proven to her satisfaction, she replied "Yes."   (*Id.* at 14:16)   Asked if she followed the law that the judge instructed her on with regard to mercy, she replied that she did.   (*Id.* at 11:22-12:1.)
Bower marked "No" and wrote on the questionnaire the following:

> If the accused would be found guilty of first degree murder by me based on the evidence presented by the Prosecution, and not refuted by the Defense, I believe the defendant should not be afforded the opportunity for freedom.   A recommendation of mercy in such a case would indicate to me a lack of conviction on the part of the juror on their decision or verdict.   I also do not feel that the defendant or the convicted person's remorse or rehabilitation does not really lessen or change the fact that a murder was committed.

(Test. of David Bower 13:13-21, ECF No. 19-2.)   Bower subsequently testified in connection with the questionnaire.   When asked what his answer would have been if he had been asked during *voir dire* if he would have been willing to consider mercy in a first degree murder case, he replied "I would say I would consider it, but in the back of my mind I would be wondering why would they ask me that?   Do they have no confidence?   But in my mind, yes, I would consider it."   (*Id.* at 9:19-20.)   He later reaffirmed that that would have been his answer, stating "Yes, I would consider it."   (*Id.* at 11:10.)   When defendant's counsel asked him whether his previous statements were not inconsistent with his answer to the questionnaire, the following exchange took place:

when they failed to *voir dire* the prospective jurors on whether they would impartially consider a recommendation of mercy if they found Petitioner guilty of murder in the first degree.   (*Id.* at 8.)

Petitioner's *voir dire* claims were denied on the merits by the Circuit Court of Kanawha County, and, on appeal, the Supreme Court of Appeals of West Virginia found no error.   (*See* ECF No. 10-2, Exs. 13, 15 at 64–65, 188.)[3]   Accordingly, 28 U.S.C. § 2254(d) applies.

As to Ground 1, at the time of Petitioner's conviction, it was clearly established that trial counsel must be permitted to ask jurors whether they would automatically vote against the death penalty no matter what the facts of the case were.   *Morgan v. Illinois*, 504 U.S. 719, 728, (1992). A new trial may be warranted if a juror failed to answer honestly a material question on *voir dire* and the correct response would have provided a valid basis to challenge for cause.   *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 555 (1984).   A death sentence cannot be rendered by a jury from which prospective jurors who voiced objection to the death penalty have been excluded for cause, *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968), although a pronouncement of guilt in a bifurcated death penalty trial may be rendered by such a jury, *Lockhart*

---

| A | It does appear to be so.   I do not mean to commit perjury, but . . . |
| Q | So you did seem to indicate - - |
| A | Recollection is - - |
| Q | - - that had you been asked the question, you would not have . . . |
| A | I would not have considered mercy.   No, I would not have. |

(*Id.* at 14:5-12.)   Later, defendant's counsel's paralegal read notes she purportedly took after a phone call with Bower a year earlier, paraphrasing statements purportedly made by Bower from which it appeared that Bower was quite adamant that he would under no circumstances ever consider mercy after a conviction of first degree murder.   (*Id.* at 19–22.)

[3] The record of Petitioner's trial and state collateral proceedings has been attached as a number of exhibits to Respondent's Motion for Summary Judgment (ECF No. 10).   Because many of these exhibits are short and do not contain page numbers, the Court cites them according to the pagination provided in the ECF header.   For sake of clarity, the Court will follow this practice with regard to the trial transcripts themselves; that is, trial transcripts are cited according to the ECF pagination.

*v. McCree*, 476 U.S. 162, 162 (1986).   However, Petitioner has not identified, and this Court has not found, any clearly established federal law providing for a right to a jury free of bias respecting non-capital penalties to be imposed upon a finding of guilt when such bias was not concealed during *voir dire* and has only been uncovered after conviction.[4]   Accordingly, the Court cannot find that the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.

As to Ground 2(A), Petitioner specifically objects to the following finding in the PF&R:

> In the instant case, the evidence clearly demonstrates that trial counsel's failure to question the proposed jurors concerning their ability to grant mercy if the defendant were convicted of first degree murder was a strategic decision, and it is well-settled that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690.

(ECF No. 29 at 6; *cf.* ECF No. 25 at 33.)

The PF&R in turn relied on the following finding of fact made by the Circuit Court of Kanawha County after a hearing on Petitioner's habeas claim:

> Trial counsel, Matthew Victor, testified that not inquiring about mercy during voir dire was a strategy decision due to the defense theory that the defendant did not commit the murder.

(ECF No. 10-2, Ex. 13 at 65.)

Petitioner asserts in his objections that "[i]n reality, Mr. Victor's [sic] testified that he did not know why he failed to *voir dire* potential jurors as to whether they would consider . . .

---

[4]  *Cf. Tanner v. United States*, 483 U.S. 107, 120 (1987) ("There is little doubt that postverdict investigation into juror misconduct would in some instances lead to the invalidation of verdicts reached after irresponsible or improper juror behavior.   It is not at all clear, however, that the jury system could survive such efforts to perfect it."); *McDonough*, 464 U.S. at 555 ("A trial represents an important investment of private and social resources, and it ill serves the important end of finality to wipe the slate clean simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on *voir dire* examination.").

recommending mercy." (ECF No. 29 at 5.)   Petitioner argues that counsel's failure to conduct *voir dire* on the issue of mercy was not strategic, because not consciously made.   (*Id.* at 6.) Petitioner makes this argument for the first time in his objections to the PF&R.[5]

As a habeas corpus petitioner challenging a state conviction on grounds of ineffective assistance of counsel, Petitioner faces an uphill battle.   A successful claim must overcome two layers of deference: that accorded by *Strickland v. Washington*, 466 U.S. 668 (1984), to counsel's assistance, as well as that accorded by § 2254(d) to the state court determination of that ineffective assistance.   As the Supreme Court has noted, "the standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, the review is 'doubly' so." *Harrington*, 562 U.S. at 105 (citations omitted).   Therefore, within the strictures of § 2254(d), the question is not "whether counsel's actions were reasonable.   The question is whether there is any reasonable argument that counsel satisfied *Strickland*'*s* deferential standard."   *Id*.   As described below, Petitioner's particular *Strickland* challenge implicates both subsections of § 2254(d).   The ultimate question for this Court is whether the state court's adjudication of Petitioner's *voir dire*-based ineffective assistance claim "was an unreasonable application" of the law clearly established in *Strickland*.   28 U.S.C. § 2254(d)(1); *see also Tice v. Johnson*, 647 F.3d

---

[5]  Indeed, his petition asserts the contrary:

> Mr. Matthew A. Victor, Keener's co-counsel, indicated that whether a defense counsel should *voir dire* prospective jurors on the mercy issue depends on the theory of the defense. Mr. Victors [sic] confessed he did not *voir dire* prospective jurors on the issue of mercy because such questions would be inconsistent with the defense that the defendant did not commit the crime.

(ECF No. 2 at 6.)   Petitioner's Motion for Partial Summary Judgment similarly challenged the reasonableness of the alleged trial strategy, but did not challenge the state court finding, noting only that when asked about the *voir dire* issue at the state habeas proceeding, "Mr. Victor replied that his decision to forgo questioning prospective jurors about mercy in the event of a guilty verdict 'was a strategy decision due to the defense theory that the defendant did not commit the murder.'"   (ECF No. 19 at 10.)

87, 103 (4th Cir. 2011) ("The rule and analytical framework announced by the Supreme Court in *Strickland* 'unquestionably qualifies as 'clearly established' federal law under § 2254(d).'" (quoting *Frazer v. South Carolina*, 430 F.3d 696, 703 (4th Cir. 2005))).

*Strickland*'s first prong focuses on counsel's performance. The "overriding, and ultimately determinative, inquiry courts must make under *Strickland*'s deficient performance prong" is whether, "after 'considering all the circumstances,' counsel's performance fell 'below an objective standard of reasonableness.'" *Bullock v. Carver*, 297 F.3d 1036, 1047 (10th Cir. 2002) (quoting *Strickland*, 466 U.S. at 688). "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. To provide such deference and facilitate the ultimate determination of objectively reasonable performance, courts employ two presumptions when analyzing *Strickland* claims. The first is an overarching presumption that counsel acted reasonably, and that his challenged conduct might have been part of a sound trial strategy. *Id*. The burden is on the challenger in all ineffective assistance cases to overcome this presumption and demonstrate that counsel's identified acts or omissions were outside the wide range of professionally competent assistance. *Burr v. Lassiter*, 513 Fed. App'x 327, 340 (4th Cir. 2013) (citing *Strickland*, 466 U.S. at 689).

The second presumption is stronger but more particularized. It applies only in situations where it is demonstrated that the challenged attorney conduct was the result of a "strategic choice." *Strickland* recognized that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." 466 U.S. at 690. Thus, although it is generally presumed that an attorney's conduct might be part of a legitimate trial strategy, that presumption is heightened where the attorney can show that his act or omission was actually a

10

strategic choice made upon reasonable investigation.   *See id.* at 690–91; *Barrett v. United States*, 965 F.2d 1184, 1193 (1st Cir. 1992) (distinguishing between presumption that counsel acted objectively reasonably and in a way that might be considered strategic, on the one hand, and presumption of validity for strategic choices made after thorough investigation on the other).   The "virtually unchallengeable" presumption of reasonableness applies only where it can be shown that (1) counsel made a strategic decision and (2) that the decision was adequately informed. *Bullock*, 297 F.3d at 1047.

An attorney's failure to demonstrate that a given trial strategy was a "strategic choice," either because it was not consciously decided or based upon an inadequate investigation, forfeits the "virtually unchallengeable" presumption of objective reasonableness but does not by itself amount to constitutionally deficient performance.   *Id.* at 1048.   The ultimate inquiry a court must make in assessing *Strickland*'s first prong is not "whether counsel's choices were strategic," but whether those choices were objectively reasonable.   *Roe v. Flores-Ortega*, 528 U.S. 470, 481 (2000).   Whether or not an attorney's challenged conduct can be classified as a strategic choice, the determinative assessment is the overall reasonableness of the attorney's conduct, in light of the particular circumstances of the case.   *See Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986) (noting that a reviewing court should generally "assess counsel's overall performance throughout the case in order to determine whether the 'identified acts or omissions' overcome the presumption that a counsel rendered reasonable professional assistance" (quoting *Strickland*, 466 U.S. at 689)); *Harich v. Dugger*, 844 F.2d 1464, 1469 (11th Cir. 1988) (noting that the presumption in favor of effective assistance requires that "courts will not find that an attorney is incompetent for using a particular approach to a case so long as that approach was reasonable"); *Bullock*, 297 F.3d at 1051

11

(whether or not *Strickland* presumptions apply, "[i]f the performance was objectively reasonable, then the ineffective assistance claims fails [sic].").

On *Strickland*'s second prong, "the defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.   Further, *Strickland* makes clear that either prong of its test for ineffective assistance of counsel may be analyzed first, and thus, if no prejudice is shown by a petitioner, a court need not analyze counsel's performance.   *Id.* at 697.

The state court determined that the fact that Petitioner's counsel did not *voir dire* the jury panel on mercy was a strategic decision entitled to heightened deference.   Although the ultimate reasonableness of counsel's strategic choice is a question of law to be reviewed under § 2254(d)(1), the prior question of whether counsel actually made a strategic choice is a question of fact.   *Wood v. Allen*, 558 U.S. 290, 304 (2010).   Thus, this Court can only disturb that determination if Petitioner can demonstrate that it was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d)(2).   Here, even according the deference due the state court adjudication, the Court agrees with Petitioner that his counsel's failure to *voir dire* the jury on mercy was not reflective of a strategic choice.   However, because the Court recognizes that counsel's overall performance was at least arguably reasonable from an objective standpoint, it does not find the state court's ultimate rejection of the ineffective assistance claim to be an unreasonable application of clearly established federal law.   *Id.* at § 2254(d)(1).

At the habeas hearing before the Circuit Court of Kanawha County, Matthew Victor was asked the following:   "You didn't bring up the issue of mercy with the jury because it would be inconsistent with your defense he didn't do it; is that correct?"   (ECF No. 10-10, Ex. 30 at 116.) He replied:   "Right."   (*Id.*)   While this answer to a leading question is essentially the only evidence that Petitioner's trial counsel made a strategic decision on the *voir dire* issue, there is much evidence that the issue was simply not on counsel's radar.

When Matthew Victor was asked if "it was your decision as part of your strategy not to bring up mercy in the *voir dire* of the jury because your defense was that he was not guilty," he replied, "The defense was he didn't do it.   I am not sure that this was a discussion with Mr. Samples and [co-counsel] Mr. Keener.   The issue was did he do it or didn't he do it.   And that's probably the best I can answer it."   (*Id.* at 116–17.)   Later, he added, "I simply don't remember if we *voir dired* the jury or not.   If we didn't, we didn't.   The defense at trial was:   He didn't do it. . . . The defense was:   I didn't do it.   I didn't have anything to do with it."   (*Id.* at 118.) Asked if that was the reason why he did not *voir dire* on mercy, Victor replied, "I don't know why the decision not to *voir dire* or not to *voir dire* the jury on the issue of mercy was made.   I don't know if this was the deciding factor.   I don't know if this was one of the factors.   I don't know." (*Id.* at 119.)   Co-counsel Raymond Keener testified only that he had no recollection why he and Victor did not conduct *voir dire* on the issue of mercy.   (*Id.* at 131.)

In light of the weakness of the evidence that counsel made a conscious decision not to *voir dire* on the issue of mercy, and significant evidence to the contrary, the state court's finding of fact that it was a strategic decision appears to the Court to have been an unreasonable determination of

the facts in light of the evidence presented in the state court proceeding. Therefore, the Court declines to rely on it to find counsel's decision unchallengeable.

As described above, however, it does not automatically follow from the fact that counsel's decision was not "strategic" that counsel's decision was therefore not professionally reasonable. Even in cases where counsel admittedly errs or fails to make a conscious decision, the question of performance must be assessed at the time of the alleged error in light of all the circumstances. *Kimmelman*, 477 U.S. at 381.   Where counsel's alleged errors are of neglect or ignorance of law, he is not entitled to the heightened presumption associated with informed strategic choices and a finding of reasonableness will be correspondingly less likely.   *See Bullock*, 297 F.3d at 1050–51.

Ultimately, however, a court's task when assessing *Strickland*'s first prong is to determine the reasonableness of counsel's overall performance.   Even where, as here, the alleged attorney conduct does not qualify as a strategic choice, it is not unreasonable where a fully informed attorney could have come to the same conclusion.   *Id*. at 1053–54 (attorney's failure to object to a victim's hearsay statement in a sexual abuse case, based on erroneous interpretation of state evidence law rather than conscious, strategic choice, was not unreasonable where "a fully informed attorney could have concluded that admitting the hearsay statement was to [the defendant's] advantage . . . "); *United States v. Smith*, 10 F.3d 724, 729 (10th Cir. 1993) (counsel's failure to request a jury instruction for a lesser included offense to the crime charged, based on counsel's unawareness of the offense's availability, was not objectively unreasonable because, "where counsel's actual representation is objectively reasonable under all the circumstances of a case and ensured that the defendant received a fair trial overall, it makes no difference that certain decisions may have been unreasonable or made without a full recognition of the consequences.").

14

In this case, had the jurors been *voir dired* on the issue of mercy and given the answers which they gave on the questionnaires sent to them by Petitioner's habeas counsel, they may well have been dismissed for cause.   However, *Strickland* does not require counsel to ask every question which might result in the dismissal of a prospective juror for cause in a given case. Petitioner does not allege that counsel ignored or failed to investigate indicia of prospective juror bias that had arisen during jury questioning.   It is apparent from the counsel's testimony that the overall trial strategy was one of complete innocence.   Even if counsel did not directly take that strategy into account when deciding not to *voir dire* on mercy, the ultimate decision not to ask the question might still very well be reasonable in light of that overall strategy.   As has been noted in response to similar claims before this Court, it is not professionally unreasonable under the circumstances to omit to conduct *voir dire* on the issue of mercy, where such questioning could foreseeably create the risk of creating a negative presumption of Petitioner's guilt.   *See Muncy v. McBride*, No. 3:06-0180, 2009 WL 3190453, at *3–4 (S.D. W. Va. Sept. 30, 2009); *see also Humphrey v. Ballard*, No. 2:08-CV-00879, 2009 WL 2762331, at *11 (S.D. W. Va. Aug. 25, 2009) (noting that counsel's decision not to argue for mercy before a jury where the theory of the case was actual innocence "did not fall below an objective standard of reasonableness, and did not constitute *per se* ineffective assistance of counsel . . .").

Further, in this case, determining whether or not counsel's performance actually violated *Strickland* is not the task for this Court.   Under the relevant § 2254(d)(1) standard, the pivotal question is "whether the state court's application of the *Strickland* standard was unreasonable." *Harrington*, 562 U.S. at 101.   "That a petitioner's *Strickland* claim may have had merit does not alone justify awarding habeas; 'even a strong case for relief does not mean the state court's

contrary conclusion was unreasonable' under the AEDPA." *Moore v. Hardee*, 723 F.3d 488, 496 (4th Cir. 2013) (quoting *Harrington*, 562 U.S. at 88).   Although the state court erroneously determined that the *voir dire* decision was a strategic choice, it nonetheless acknowledged that declining to mention mercy in the face of an actual innocence defense satisfied the first prong of *Strickland*.   Specifically, the West Virginia Supreme Court of Appeals noted that "in reviewing counsel's performance under an objective standard in light of the circumstances, this Court finds that a reasonable lawyer would have acted as defense counsel acted."   (ECF No. 10-2, Ex. 15 at 189.)   In light of counsel's overall performance, pursuing absolute innocence and seeking to avoid any negative inferences of guilt from mentioning mercy, there is a "reasonable argument that counsel satisfied Strickland's deferential standard."   *Harrington*, 562 U.S. at 89.   As such, the state court's reasonableness determination was not an unreasonable application of clearly established federal law.

Accordingly, the Court **OVERRULES** Petitioner's objection as to Grounds 1 and 2(A).

### B.  Introduction of Evidence of Petitioner's Criminal History and the Failure to Seek a Limiting Instruction (Habeas Petition Grounds 2(B) and 2(C))

Next, Petitioner objects to the PF&R's conclusion that Respondent is entitled to summary judgment as to Grounds 2(B) and 2(C) of Petitioner's § 2254 petition.   (ECF No. 29 at 8–10.)

In Ground 2(B), Petitioner argues that his trial counsel provided ineffective assistance of counsel when they informed the jury that Petitioner was a convicted felon, was still under supervision at the time of the offenses, had violated the terms of his parole, and was attempting to evade his parole officer.   (ECF No. 2 at 8.)   In Ground 2(C), Petitioner argues that his trial counsel provided ineffective assistance of counsel when they failed to propose a limiting instruction for the judge to give the jury regarding the prior conviction and parole status.   (*Id.*)

16

Both grounds were raised in petitioner's second petition for a writ of habeas corpus filed in state court; they were denied on the merits by the Circuit Court of Kanawha County, and, on appeal, the Supreme Court of Appeals of West Virginia found no error.   (ECF No. 10-2, Exs. 13, 15 at 66–67, 188.)   Thus, the standard of review set forth in § 2254(d) applies.   Again, because "a reasonable application of federal law is different than incorrect application of federal law," *Harrington*, 562 U.S. at 101, that means greater deference to the effectiveness of counsel than is the case for claims involving direct review of the *Strickland* standard.   The state court determination must be upheld so long as "fairminded jurists could disagree" on its correctness. *Yarbrough v. Alvarado*, 541 U.S. 652, 664 (2004).

At the habeas hearing before the Circuit Court of Kanawha County, Petitioner's trial counsel Matthew Victor testified that Petitioner's trial counsel explained his prior conviction and parole status to the jury because Petitioner put on witnesses who were incarcerated and they were likely to indicate that Petitioner was in prison with them, and because it was counsel's strategy to get out in front of and minimize the issue.   (ECF No. 10-10, Ex. 30 at 97–102, 110–11, 123.)   A secondary motivation appears to have been the desire to suggest that police had been unable to locate Petitioner after the victim's death because he was running from the police due to a parole violation, not because he was guilty of the murder.   (*Id.* at 97, 112–13, 134–35.)   Victor indicated that there was also something else in the record that made counsel introduce the fact that Petitioner was in prison, although—testifying fourteen years after the trial and without the benefit of having been able to review the trial record—he did not recall what it was.   (*Id.* at 107–09, 112–13.)   Even if all the details are not crisply clear, it appears that Petitioner's counsel made a considered decision to introduce the evidence of Petitioner's prior conviction and parole status,

17

and the Court does not find counsel's decision to be objectively unreasonable.   Hence, Ground 2(B) did not constitute ineffective assistance of counsel.

As to why no limiting instruction was requested, Matthew Victor could not recall why no limiting instruction was sought.   (ECF No. 10-10, Ex. 30 at 109–11.)   Petitioner's trial counsel Raymond Keener testified at the habeas hearing that he and Victor probably should have requested a limiting instruction, but "it's one of those errors that you make in the heat of battle."   (*Id.* at 140.)   Notwithstanding this admission and the lack of a reasoned explanation for the failure to request a limiting instruction, the Court does not believe that counsel's performance was objectively unreasonable.   *See United States v. Lindsay*, 157 F.3d 532, 536 (7th Cir. 1998) ("[L]awyers often make the strategic choice not to request limiting instructions, because they wish to avoid underscoring the troublesome material for the jury."); *Barbe v. McBride*, No. CIVA 5:04CV53, 2005 WL 6128996, at *8 (N. D. W. Va. Sept. 28, 2005) ("[I]n the face of legitimate 404(b) evidence, it is within trial counsel's discretion not to seek a limiting instruction, and thereby avoid drawing undue attention to such evidence."), *overruled on other grounds*, 521 F.3d 443 (4th Cir. 2008).   Therefore, the Court **FINDS** that the WVSCA did not render a decision that was "contrary to," or "an unreasonable application of," *Strickland* by finding that defense counsel's performance in this regard was not constitutionally deficient.   28 U.S.C. § 2254(d)(1).

Yet even if the failure to request the instruction about Petitioner's prior conviction and parole status was deficient representation, it is unlikely that a limiting instruction would have changed the outcome of the trial given the substantial circumstantial evidence of Petitioner's guilt. *See Berghuis v. Thompkins*, 560 U.S. 370, 389 (2010) (trial counsel's failure to request limiting instruction did not amount to ineffective assistance of counsel in light of the compelling evidence

of defendant's guilt).   To establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."   *Strickland*, 466 U.S. at 694.

Indeed, the PF&R and the state court record in this case highlight ample evidence from which the jury could have based its guilty verdict.   (*See infra* Section III.E.)   This record does not support the conclusion that the outcome of Petitioner's trial probably would have been different if only counsel had sought a limiting instruction about Petitioner's prior conviction and parole status.   *Strickland*, 466 U.S. at 694.   The Court therefore **FINDS** that Petitioner has failed to demonstrate prejudice resulting from his counsel's perceived error.   Within the confines of § 2254(d)(1), the state court's ultimate determination that *Strickland* was not violated was not an unreasonable application of clearly established federal law, and so must be upheld.

Accordingly, the Court **OVERRULES** Petitioner's objection as to Grounds 2(B) and 2(C).

### C. Witnesses Dressed in Prison Garb (Habeas Petition Grounds 2(D) and 6)

Next, Petitioner objects to the PF&R's conclusion that Respondent is entitled to summary judgment as to Grounds 2(D) and 6 of Petitioner's § 2254 petition.   (ECF No. 29 at 10–13.)

In Ground 2(D), Petitioner argues that his trial counsel provided ineffective assistance of counsel when they failed to ensure that two defense witnesses did not appear before the jury in distinctive prison garb, in restraints, and under the obvious supervision of prison officers.   (ECF No. 2 at 8.)   In Ground 6, Petitioner argues that he was denied a fair trial by the fact that the two witnesses appeared in distinctive prison garb and in restraints.   (*Id*. at 16.)   Both grounds were raised in Petitioner's third petition for a writ of habeas corpus filed in state court, where they were summarily dismissed by the Circuit Court of Kanawha County and, on appeal, by the Supreme

19

Court of Appeals of West Virginia.   (ECF No. 10-2, Ex. 18 at 203–205; ECF No. 10-1, Ex. 3 at 53–54; ECF No. 25 at 44 n.9.)   Thus, the standard of review set forth in § 2254(d) applies.

At the time of Petitioner's conviction, it was clearly established that

the State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes, [although] the failure to make an objection to the court as to being tried in such clothes, for whatever reason, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation.

*Estelle v. Williams*, 425 U.S. 501, 512 (1976).   However, Petitioner has not identified, nor has this Court found, any clearly established federal law extending the holding of *Estelle* to incarcerated individuals testifying as defense witnesses.[6]   Moreover, although Petitioner argues that he was prejudiced by the obvious supervision of his inmate witnesses by prison guards, "the conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial is [not] inherently prejudicial."   *Holbrook v. Flynn*, 475 U.S. 560, 568 (1986).   Therefore, the

---

[6]  Petitioner notes that the West Virginia Supreme Court of Appeals has found that requiring incarcerated defense witnesses to testify shackled and in prison garb may create a significant risk of prejudice.   *See Gibson v. McBride*, 663 S.E.2d 648, 655 (W. Va. 2008) (granting writ of habeas corpus where prosecution's incarcerated witnesses were permitted to testify in civilian clothing but the defendant's were not); *State v. Allah Jamaal W.*, 543 S.E.2d 282, 285 (W. Va. 2000) (an incarcerated witness for the defense must not be forced to testify in prison garb, but it is incumbent upon defense counsel to move for the witness to be permitted to testify in civilian clothes). These cases do not establish a sweeping rule; rather, they hold that, in particular circumstances, defense witnesses who testify before the jury in prison garb and shackles may appreciably impact the jury's assessment of their credibility and deprive the defendant of the right to a fair trial.

Since the Court is tasked with the interpretation and enforcement of federal, not state law, these West Virginia cases are not relevant to the inquiry of whether defense counsel's actions in this instance ran contrary to clearly established federal law.   28 U.S.C. § 2254(d)(1).   In any event, the Court finds that neither *Gibson* nor *Allah Jamaal* alters its conclusion that Petitioner suffered no prejudice.   *Gibson's* holding was based on the unfair disparity between the prosecution's witnesses, who were allowed to rid themselves of their prison jumpsuits and shackles before testifying, and the witnesses for the defense, who were not.   *Allah Jamaal* merely finds that a trial court must not compel defense witnesses to testify in prison attire upon motion of the defense.   The fact that Petitioner's counsel did not make such a request is undisputed; indeed, it is the alleged error that forms the subject of Petitioner's claims.

state court dismissal of Petitioner's Ground 6 claim was not contrary to, nor did it involve an unreasonable application of, clearly established federal law.

As to Petitioner's Ground 2(D) claim, the state courts' application of *Strickland* was not unreasonable.   Because Petitioner's inmate witnesses testified about alleged conversations that took place in the prison where they were incarcerated with Petitioner (*see* ECF No. 25 at 22), the jury already knew that the witnesses were inmates.   *See*, *e.g.*, *Harlow v. State*, 105 P.3d 1049, 1060 (Wyo. 2005) (where jury knew that the prisoner and two witnesses were all inmates, no prejudice from seeing them in shackles).   Hence, it would not be unreasonable to conclude that Petitioner suffered no prejudice.

In his objections to the PF&R, Petitioner adds in support of Grounds 2(D) and 6 that his counsel was deficient in failing to request a limiting instruction.[7]   A limiting instruction is typically used as a tool to limit the use of evidence admissible for some purpose but not others. *See* Christopher Mueller and Laird C. Kirkpatrick, *Federal Evidence* § 1:41 (4th ed. 2015).   A witness's attire is not "evidence" and, since the risk posed by witnesses testifying in prison jumpsuits relates to the jury's assessment of their credibility, it is unclear how the trial court could have crafted a limiting instruction impinging on the jury's freedom to make determinations in this realm.[8]   Petitioner has not submitted a proposed limiting instruction of his own.   Since the Court cannot conceive of how the limiting instruction Petitioner alleges should have been given could

---

[7]  This argument appears to be raised as independent grounds for an ineffective assistance of counsel claim. Because it is asserted for the first time in his objections to the PF&R, it is not properly before the Court. *See* Section III.G, *infra*. The Court, in its discretion, nonetheless elects to address the merits of the argument.
[8]  The Court notes that the trial court properly instructed the jury with regard to their assessment of witness credibility.   ECF No. 10-9, Ex. 27 at 85–87.

have possibly have benefitted him, the Court cannot find that counsel's performance was sub-standard in failing to request one.

Due to the dearth of federal law bearing on the subject of defense witnesses testifying in prison-issued attire, the Court **FINDS** that the state court's rulings did not run contrary to clearly established federal law.   The Court makes the same finding with regard to Petitioner's ineffective assistance of counsel of claim bearing on the same topic.   With no indication that Petitioner suffered prejudice from his counsel's failure to object to defense witnesses testifying in their prison garb, the state court's rulings were not contrary, to nor an unreasonable application of, clearly-established federal law.   Accordingly, the Court **OVERRULES** Petitioner's objection as to Grounds 2(D) and 6.

### D.    Sufficiency of Indictment (Habeas Petition Ground 3)

Next, Petitioner objects to the PF&R's conclusion that Respondent is entitled to summary judgment as to Ground 3 of Petitioner's § 2254 petition.   (ECF No. 29 at 13–16.)

In Ground 3, Petitioner argues that the indictment did not contain all of the essential elements for felony murder because it did not mention the underlying predicate felony for felony murder.[9]   (ECF No. 2 at 9–10.)   Petitioner was charged by a three-count indictment with first degree murder (Count One), aggravated robbery (Count Two), and burglary (Counts Three and

---

[9]  A defective indictment claim arises from an alleged violation of the right to due process.   Petitioner's § 2254 Petition alleged only that the indictment was "constitutionally insufficient."   (ECF No. 2 at 9.)   In his objections to the PF&R, however, Petitioner also criticizes his counsel's failure to object to the indictment's perceived deficiencies.   He argues that trial counsel "failed to contest the validity of an indictment that did not allege the murder was committed during the commission of an aggravated robbery . . . [or] of a burglary."   (ECF No. 29 at 14–15.)   To the extent these statements constitute an attempt to allege an ineffective assistance of counsel claim under the Sixth Amendment, and without considering whether such a claim has been exhausted at the state level, the Court **FINDS** that Petitioner has waived his right to bring this claim by raising it for the first time in his objections to the PF&R.   *See* Section III.G, *infra*.

Four).[10]   (ECF No. 10-1, Ex. 4 at 1–2.)   The aggravated robbery and burglary charges ultimately served as the predicate felonies for Petitioner's felony-murder conviction.   (ECF No. 10-1, Ex. 5 at 1–2.)   Ground 3 was asserted in Petitioner's petition for a writ of habeas corpus filed in state court, where it was dismissed by the Circuit Court of Kanawha County and, on appeal, by the Supreme Court of Appeals of West Virginia.   (ECF No. 10-2 at 67–68; *id.* at 189; ECF No. 25 at 49–50.)   Thus, the standard of review set forth in § 2254(d) applies.

Petitioner's argument is foreclosed by this Court's decisions in *Humphrey v. Ballard*, No. 2:08–cr–00879, 2009 WL 2762331, at *6 (S.D. W. Va. Aug. 25, 2009) and *Roberts v. Ballard*, No. 1:13-23245, 2014 WL 4929403, at *24–27 (S.D. W. Va. Sept. 30, 2014), in which this argument was addressed and rejected with respect to a similar indictment, under the same statute, in the same posture as this case.   These cases stand for the proposition that an indictment need not specifically charge felony murder in order to comport with due process.   *See also State v. Hughes*, 691 S.E.2d 813, 819 (W. Va. 2010) (indictment need not expressly charge felony murder*); State v. Satterfield*, 457 S.E.2d 440, 450 (W. Va. 1995) (same); *State v. Justice*, 445 S.E.2d 202, 208 (W. Va. 1994); *State v. Young*, 311 S.E.2d 118, 134 (W. Va. 1983); *State v. Bragg*, 235 S.E.2d 466, 471–72 (W. Va. 1977) (same).   In *Young*, the West Virginia Supreme Court of Appeals held:

> An indictment which charges that the defendant feloniously, wilfully, maliciously, deliberately, premeditatedly and unlawfully did slay, kill and murder is sufficient to support a conviction for murder committed in the commission of, or attempt to commit arson, rape, robbery or burglary, it not being necessary, under W. Va. Code, 61–2–1, to set forth the manner or means by which the death of the deceased was caused.

311 S.E.2d at 135 (citing Syl. Pt. 5, *Bragg*, 235 S.E.2d at 466).

---

[10]   Count Three charged burglary by breaking and entering; Count Four charged burglary by entering only.

This reasoning is reflective of the long-standing principle in West Virginia that an indictment "need not specify the State's theory of prosecution." *Hughes*, 691 S.E.2d at 225 (citing *Humphrey*, No. 2:08-cv-00879, 2009 WL 2762331, at *6 (S.D. W. Va. Aug. 25, 2009)) (emphasizing that West Virginia's first-degree murder statute enumerates three broad categories of first-degree homicide: "(1) murder by poison, lying in wait, imprisonment, starving; (2) by any wilful, deliberate and premeditated killing; (3) in the commission of, or attempt to commit, arson, rape, robbery or burglary"). As noted by the Magistrate Judge, this West Virginia precedent is consistent with federal law establishing that an indictment comports with due process when it states the elements of the charged offense, puts the accused on notice of the charge against which he must defend, and enables a defendant to rely on his conviction in order to avoid double jeopardy. *Hamling v. United States*, 418 U.S. 87, 117 (1984).

The Court **FINDS** that Petitioner has failed to show that the indictment's language denied him of due process. The Court further **FINDS** that Petitioner has not demonstrated that the state courts' decisions denying habeas corpus relief on grounds of the alleged insufficiency of the Indictment were contrary to, or an unreasonable application of, clearly established federal law. Accordingly, the Court **OVERRULES** Petitioner's objection as to Ground 3.

### E. Sufficiency of Evidence on Robbery and Burglary and Denial of Judgment of Acquittal (Habeas Petition Grounds 4 and 5)

Next, Petitioner objects to the PF&R's conclusion that Respondent is entitled to summary judgment as to Grounds 4 and 5 of Petitioner's § 2254 petition. (ECF No. 29 at 16–20.)

In Ground 4 of his federal petition, Petitioner argues that there was insufficient evidence to convict him of aggravated robbery and burglary,[11] the underlying predicate felonies for the

---

[11] In his objections as to this claim, Petitioner asserts that "the court never should have instructed the jury

felony murder charge of which Petitioner was found guilty.   (ECF No. 2 at 11; *cf.* ECF No. 10-1, Ex. 5 at 59–60.) Related to this claim, in Ground 5 Petitioner argues that he was denied due process when the trial court denied his motion for acquittal at the conclusion of the State's case-in-chief. (ECF No. 2 at 12–14.)   Both arguments were raised and summarily denied on Petitioner's direct appeal.   (ECF No. 10-1, Ex. 7 at 65, 83–84.)

Evidence is sufficient to support a conviction when "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt." *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) (emphasis in original).   Sufficiency challenges— also known as *Jackson* claims—are subject to two layers of deference in federal habeas proceedings.

> First, on direct appeal, it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial.   A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury.

*Coleman v. Johnson*, 132 S. Ct. 2060, 2062 (2012) (internal quotation marks and citations omitted). Second, the federal habeas court may overturn a state court decision rejecting a sufficiency of the evidence challenge only if the state court decision was "objectively unreasonable." *Id.*   In evaluating a sufficiency of the evidence challenge, whether in the context of a habeas proceeding or on direct appeal, the province of the jury is entitled to deference.   The Court must not "reweigh the evidence, re-evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." *White v. Steele*, 602 F.3d 707, 710 (6th Cir. 2009) (addressing

---

on the elements of burglary."   (ECF No. 29 at 18.)   The Court reads that language to be simply a part of his argument in furtherance of his attack on the sufficiency of the evidence, and not a completely new, separate claim assailing the jury instructions.

deferential standard within the context of a § 2254 proceeding) (citation omitted); *Wright v. Muncy*, 872 F.2d 420, *1 (4th Cir. 1989) (unpublished table decision) (credibility of witnesses is not susceptible to review in a habeas case); *Banks v. Powell*, 917 F. Supp. 414, (E.D. Va. 1996) (the jury's determination of witness credibility cannot be questioned).

Petitioner's sufficiency challenge was raised and adjudicated, albeit in summary fashion, by the West Virginia Supreme Court of Appeals.   (ECF No. 10-1, Ex. 7 at 65); *see Thomas*, 170 F.3d at 475 (explaining that "adjudication on the merits" includes claims that were decided summarily in state court).   It is not for this Court to decide whether or not it agrees with the State court.   Rather, this Court is tasked only with determining whether it was objectively unreasonable for the West Virginia Supreme Court of Appeals to conclude that a rational trier of fact, after viewing the evidence in the light most favorable to the prosecution, could have found that Petitioner committed the offense of conviction beyond a reasonable doubt.   28 U.S.C. § 2254(d); *see Cavazos v. Smith*, 132 S. Ct. 2, 3 (2011) (citation omitted).

The application of this highly deferential standard to the instant case compels the conclusion that Petitioner's sufficiency challenge must fail.   As to the predicate offense of aggravated robbery, the State was required to prove the following five elements of the common law robbery offense: (1) the unlawful taking and carrying away, (2) of money or goods, (3) from the person of another or in his presence, (4) by force or putting him in fear, and (5) with intent to steal the money or goods.   *See* Syl. Pt. 1, *State v. Harless*, 285 S.E.2d 461 (W. Va. 1981).[12]   The additional element of aggravation required proof that Petitioner committed a common law robbery through either violence to the victim, presentation of a firearm or other deadly weapon, or

---

[12]   West Virginia codified the common law definition of robbery in 2000.   W. Va. Code § 61–2–12 (2000).

threatened use of a firearm where the victim reasonably believed that Petitioner had possession of a firearm.   *State v. Phillips*, 485 S.E.2d 676, 681 (W. Va. 1997).

Ample evidence suggested that various personal items, including jewelry and a stun gun, were taken from the victim at the time of the murder.   During the trial, the jury was presented with evidence that the victim received a stun gun on Saturday, the eve of her death (ECF No. 10-4, Ex. 22 at 96), although it was not found after the victim's body was discovered (ECF No. 10-3, Ex. 21 at 129).[13]   Petitioner's girlfriend testified that Petitioner traded a stun gun for drugs on Saturday or Sunday night.   (ECF No. 10-6, ECF 24 at 240–41).   The jury also heard testimony that on Monday morning—just one day after the victim's death, according to the medical examiner—Petitioner gave his girlfriend some jewelry to pawn on his behalf.   He elected not to enter the pawn store with her, but instead waited in the parked car outside.   (*Id.* at 220-22.)   A local jewelry salesman later testified that the pawned jewelry was identical to that purchased from him by the victim.   (*Id.* at 58–62.)   In fact, the receipt from the victim's purchase of that jewelry, as well as an empty jewelry box, was discovered in her bedroom with the body.   (ECF No. 10-3, Ex. 21 at 48.)   The victim's friend also testified that she recognized the pawned jewelry as similar to the victim's, noting that she had personal experience working the necklace's clasp.   (ECF No. 10-6, ECF 24 at 44.)   While Petitioner's competing evidence suggests that the jewelry and stun gun in his possession on the weekend of the murder were not formerly owned by the victim, a rational jury could have concluded from these remarkable coincidences of fact that the jewelry and

---

[13]  The following evidentiary summary is not meant to provide an exhaustive review of all evidence that could possibly have been employed to support a guilty verdict in this case.   Such a review would be both unnecessary and impractical.   Instead, the Court briefly highlights critical portions of the trial record on which a reasonable jury could have relied to establish the essential elements of each predicate to felony murder.

stun gun formerly in the victim's possession were taken from her and soon thereafter sold or traded by Petitioner.

There was also ample evidence from which the jury could conclude that the jewelry and stun gun were stolen from the victim contemporaneous to her murder.   The victim's purse was found emptied on her bed, its contents found strewn around her body, and the dresser drawer where she kept her money was found hanging open.   (ECF No. 10-3, Ex. 21 at 30.)   Melinda Garrett, the victim's friend, testified that Petitioner rushed into the victim's apartment unannounced the night before the murder, and that from his vantage point at the front door, he could have seen (indeed, the victim feared he did see) the victim removing cash from that dresser drawer.   (ECF No. 10-4, Ex. 22 at 119.)   The victim's bed was broken by what appeared to be a "fresh break." (ECF No. 10-3, Ex. 21 at 30.)   Though Petitioner's counsel argued at trial that perhaps the victim was killed elsewhere and carried into her apartment after her death, the State's evidence indicated that the victim was accosted, strangled, and stabbed after walking into her bedroom in the early hours of Sunday morning.   Petitioner, who according to trial testimony "always carried a knife," (ECF 10-7, Ex. 25 at 53), gave a knife to his great-aunt the day following the murder.   (ECF 10-6, Ex. 24 at 30–31.)   The length and width of this knife's blade was consistent with the stab wounds in the victim's neck.   (ECF 10-8, Ex. 26 at 12.)   This evidence provides justification for the jury's conclusion that the robbery was committed through violence to the victim or presentation of a deadly weapon.

The Court now turns to the evidence supporting Petitioner's felony murder conviction during the course of a burglary.   At the time of Petitioner's conviction, West Virginia defined burglary as follows:

> If any person shall, in the nighttime, break and enter, or enter without breaking, or shall, in the daytime, break and enter, the dwelling house, or an outhouse adjoining thereto or occupied therewith, of another, with intent to commit a crime therein, he shall be deemed guilty of burglary.

W. Va. Code § 61-3-11(a)·.   In order to prove that Petitioner committed a nighttime burglary, as charged in this case, the State would have had to show that Petitioner (1) in the nighttime, (2) entered, (3) the dwelling house of another, (4) with intent to commit a crime therein.   *See State v. Plumley*, 384 S.E.2d 130, 134 (W. Va. 1989).[14]

Petitioner argues in his objections that there was insufficient evidence that the alleged burglary occurred in the nighttime.   He points to evidence that the victim returned home around 6:00 a.m. or later, potentially after sunrise.   (ECF No. 25 at 17–18.)   Again, Petitioner asks the Court to accept evidence favorable to him over the evidence apparently accepted by the jury. Sufficient evidence exists from which a rational jury could conclude that the victim was killed before sunrise.   To begin, the State's forensic expert placed the time of death at approximately 5:00 a.m.   (ECF 10-7, Ex. 25 at 204.)   This opinion was based on corroborating physical evidence as well as the testimony of several witnesses who documented the victim's whereabouts in the hours before her death.[15]   Garrett testified that on the night of August 12, 1995, she accompanied the victim to Bennigan's restaurant at approximately 10 p.m.   (ECF 10-4, Ex. 22 at 90.)   They left at around 11 p.m. and made several different stops at various bars before they parted ways.   (*Id.* at 97.)   The victim, who by that point was driving Garrett's car, dropped

---

[14]  *Plumley* was decided in 1989 when the statute defined the necessary intent involved upon entering as "intent commit a felony or any larceny therein . . . ."   The statute was amended in 1993 to define the relevant intent as "intent to commit a crime therein . . . ."   *See* W. Va. Code § 61-3-11 (1993).

[15]  Dr. Irvin Sopher's conclusion was drawn from several facts, including the remains of the victim's 10 p.m. meal that were found undigested in her stomach, showing that she was killed within three to six hours of eating (ECF 10-7, Ex. 25 at 198); the degree of rigor mortis that had set in by the time the victim's body was found; and eyewitness testimony concerning the victim's activities and location on the eve of her death.

Garrett off at the home of her boyfriend, James Dunn, and left.[16]   When Garrett drove back to the

victim's apartment with Dunn between 4:30 and 5 a.m. to retrieve her car, it was not in the parking

lot (thereby giving rise to the inference that the victim had not yet returned home).   (*Id.* at 98–

99.)   When they made a second visit to the apartment at around 8:30 a.m., Garrett's car was in

the parking lot but the victim did not answer her door.   (*Id.* at 100.)

Kenneth Smith, the victim's friend, testified that he last saw the victim alive at about 5:30

a.m. on the morning of August 13, 1995.   (ECF 10-3, Ex. 21 at 6.)   The victim came to his home

in Garrett's car at approximately 4:30 a.m. that morning, where they spoke for about an hour before

the victim left his home to begin the fifteen to twenty minute drive back to her apartment.   (*Id.* at

6-7, 15.)   Smith testified that after the victim left, he waited approximately one half-hour before

calling the telephone number to her apartment between 6 and 6:30 a.m. to ensure that she had

arrived home safely.   (*Id.* at 9.)   The call went unanswered.   Smith provided this rough timeline

based on his best recollection of the night's events—since he was not wearing a watch that

morning, he acknowledged that he could not be sure exactly sure of the time of the victim's

departure.   (*Id.* at 17.)   It is therefore conceivable that the victim began the drive back to her

apartment before 5:30 a.m.

As to Petitioner's whereabouts that night, his former girlfriend Sandra Farrell testified that

she and Petitioner arrived back at his apartment after their night out at about 3 a.m. on Sunday

morning.   (ECF No. 10-6, Ex. 24 at 218.)   While she left shortly thereafter, Petitioner remained

at the apartment.   (*Id.*)   Petitioner's neighbor, Reba Butler, testified that Petitioner knocked on

---

[16] Dunn testified that Garrett arrived at his home between 3 and 3:30 a.m. (ECF 10-4, Ex. 22 at 145.)
Evidence also demonstrated that the victim used a pay phone to call David Walker, the owner of the Village
bar where the victim worked, at 3:38 a.m.   (ECF No. 10-6, Ex. 24 at 183–84, 190–91.)   At that point
Garrett was still with the victim.   (ECF No. 10-4, Ex. 22 at 96.)

her door between 4 and 5 a.m. on Sunday morning to ask for a ride to Go-Mart.   (ECF 10-6, Ex. 24 at 177-79.)   He was smoking a brown-tipped Marlboro cigarette.   (*Id.* at 172-73.)   The existence of a cigarette butt matching this description with Petitioner's DNA on it found in an ashtray in the victim's apartment (ECF No. 10-7, Ex. 25 at 143–44), coupled with testimony that the cigarette butt was not there earlier that day (ECF No. 10-4, Ex. 22 at 110), also provided evidence from which a rational jury could conclude that Petitioner was inside the victim's apartment before she arrived, and before sunrise.

There is also sufficient evidence of an unauthorized breaking and entry into the victim's home, though Petitioner argues to the contrary.   Detective Richard Ingram testified that "[t]he [victim's] door had some pry marks in the area of the spring latch," possibly "made by some type of a sharp instrument."   (ECF No. 10-3, Ex. 21 at 33–36.)   He further testified that those pry marks appeared to be "fairly fresh," though he noted that "for me to say a day or an hour or a week, that, I couldn't do."   (*Id.* at 34.)   He also found two splinters of wood on the interior of the victim's apartment which he believed came from the entry door.   (*Id.* at 35–36.)   The victim's kitchen was neat and orderly, with the exception of a Tylenol capsule box left on the counter with two capsules removed.   (*Id.* at 38.)   When the victim was discovered, one Tylenol capsule was found on the floor of her bedroom.   (*Id.* at 45.)   The other was found in the waistband of her underwear, caught between the elastic band and the victim's skin.   (ECF 10-8, Ex. 26 at 9–10.) The inference, of course, is that the victim was startled as she entered her bedroom with the Tylenol pills in her hand, dropping one on the floor while the other fell down her dress.   The ransacked condition of the bedroom compared to the neat appearance of the rest of the apartment, together with a chipped fingernail belonging to the victim on the floor near the bedroom door, also point to

an ambush in the bedroom by an assailant who was in the apartment without authorization.   (ECF No. 10-3, Ex. 21 at 26, 38, 44–46.)

Petitioner also argues in his objections that since the evidence shows that the victim received the stun gun just hours before her death, (ECF No. 10-6, Ex. 24 at 183), he could not have entered her apartment with intent to steal it if he was in her apartment *before* she returned home with the stun gun.   (ECF No. 29 at 18.)   Yet it was not necessary to show that Petitioner had the intent to steal a stun gun specifically; it was necessary for Petitioner to have had the intent to commit a crime.   Jeffrey Johnson testified that Petitioner entered the victim's apartment "to get some money" for cocaine.   (ECF No. 10-7, Ex. 25 at 73.)   Viewing the evidence in the light most favorable to the State, a rational jury, weighing the credibility of witnesses and the totality of the evidence, could have found that Petitioner entered the victim's apartment with the intent to commit a theft.[17]   Finally, it is worthy of note that the trial record does not contain any evidence of sexual assault, either prior to or after the victim's murder.   Dr. Sopher testified that the victim was "fully clothed" at the scene, and her clothing was not in disarray.   (*Id.* at 182.)   Her underwear was in normal position on her body.   (*Id.*)   This evidence further supports the inference that the victim's assailant entered the apartment with the motive to steal as opposed to some other unlawful purpose.

In the alternative, Petitioner questions the unanimity of the so-called "general verdict" returned by the jury in his case.   He reasons that the State presented armed robbery and burglary at trial as mutually exclusive predicates to the felony murder charge—that is, that the State's

---

[17]   The crime of larceny requires a showing "that the defendant took and carried away the personal property of another against his will and with the intent permanently to deprive him of the ownership thereof."   Syl. Pt. 3, *State v. Louk*, 285 S.E.2d 432 (W. Va. 1981), *overruled on other grounds by State v. Jenkins*, 443 S.E.2d 244 (W. Va. 1994).

evidence could at best prove one or the other, but not both, predicate offenses.   Relying on a trio of Supreme Court cases, Petitioner claims that a general guilty verdict cannot stand where one of the underlying theories of guilt is legally invalid.   (ECF No. 29 at 18 (citing *Griffin v. United States*, 502 U.S. 46 (1991); *Yates v. United States*, 354 U.S. 298 (1956); and *Stromberg v. California*, 283 U.S. 359 (1931)).   He insists that because the jury's general verdict encompassed both of the State's incompatible theories, it must be set aside.

The jury did not return a general verdict in this case.   A general verdict of guilty "does not reveal whether the jury found the defendant guilty of one crime and not guilty of the others, or guilty of all of them."   *United States v. Stanley*, 597 F.2d 866, 872 (4th Cir. 1979) (quoting *Bins v. United States*, 331 F.2d 390, 393 (5th Cir. 1964)).   In this case the jury specifically found that Petitioner committed felony murder during the commission of both aggravated robbery and burglary.   (ECF No. 10-1, Ex. 5 at 59–60.)   Petitioner is also incorrect that the State presented these predicate offenses as mutually exclusive theories of culpability at trial.[18]   For these reasons, the Court rejects Petitioner's objection to the PF&R on the basis that his conviction does not represent a unanimous jury verdict.

In conclusion, while Petitioner obviously favors evidence showing why the State's evidence should not be believed, the jury chose not to accept this evidence.   The fact that Petitioner offered evidence at trial that could have supported a not-guilty verdict does not mean that the State's evidence was insufficient.   The Court therefore **FINDS** that there is sufficient evidence from which a reasonable trier of fact could find that Petitioner committed felony murder

---

[18]  The State clearly believed that its evidence supported armed robbery and burglary.   For example, at the conclusion of her closing argument, the prosecutor for the State of West Virginia asked the jury to "return a verdict of guilty of first degree murder during the commission of both the burglary and the aggravated robbery."   (ECF 10-9, Ex. 27 at 121.)

during the course of an armed robbery and burglary.   Consequently, the State court's decision is neither contrary to, nor an unreasonable application of, federal law and habeas relief is not warranted.   Accordingly, the Court **OVERRULES** Petitioner's objection as to Grounds 4 and 5.

### F. Cumulative Error (Habeas Petition Ground 7)

In Ground 7 of his § 2254 petition, Petitioner contends all of the "errors" alleged in Grounds 1 through 6, even if not individually sufficient to grant habeas relief, collectively prevented him from receiving a fair trial.   (ECF No. 2 at 17.)

"Pursuant to the cumulative error doctrine, the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error."   *United States v. Basham*, 561 F.3d 302, 330 (4th Cir. 2009) (internal quotation marks omitted).   However, a "legitimate cumulative-error analysis evaluates only the effect of matters actually determined to be constitutional error."   *Fisher v. Angelone*, 163 F.3d 835, 852 n.9 (4th Cir. 1998).

The PF&R, finding no constitutional error among Grounds 1 through 6, also found that Respondent is entitled to summary judgment as to Ground 7.   (ECF No. 25 at 65–66.)   Petitioner argues in his objections that if this Court should find a violation of Petitioner's constitutional rights upon *de novo* review of PF&R as to Grounds 1 through 6, such a finding should trigger cumulative error analysis.   (ECF No. 29 at 21.)   However, having found no error of a constitutional dimension, this Court also finds no basis for engaging in cumulative-error analysis.

Accordingly, the Court **OVERRULES** Petitioner's objection as to Ground 7.

**G.      Ineffective Assistance of State Habeas Counsel (*Novel Issue not Presented to the Magistrate Judge*)**

Petitioner raises an argument in the guise of an objection to the PF&R that was not, in fact, presented to the Magistrate Judge as part of his § 2254 Petition; namely, an ineffective assistance of habeas counsel claim arising under *Martinez v. Ryan*, 132 S. Ct. 1309 (2012).    (ECF No. 29 at 7-8, 13.)    He mentions, but does not specifically describe, six "errors of omission" committed by trial counsel that allegedly deprived him of his right to effective assistance of counsel. [19] Petitioner further argues that his appointed state habeas counsel was ineffective by declining to

---

[19]  As Petitioner does not describe these alleged "errors of omission," the Court cannot identify them with certainty.    Petitioner has asserted such a number of errors of trial counsel that it becomes difficult to count them all, particularly as they have taken on slightly different forms through the years of his post-conviction proceedings.    It appears, however, that he refers here to six perceived errors of trial counsel raised in Petitioner's first pro se habeas corpus petition filed October 15, 1999 in the Circuit Court of Kanawha County.    Those errors are:

    A.  Counsel failed to request a bifurcated trial.

    B.  Counsel failed to secure a petit jury free of all disqualifications.

    C.  Counsel failed to seek sequestration of the jury despite the magnitude of the charges facing their client.

    D.  Counsel failed to perform tests recommended by Mr. Larry Dehus, a Forensic Scientist, to exclude certain state exhibits.

    E.  Counsel failed to submit the *curriculum vitae* of their defense experts despite the jurors' obvious need for such information when they determined the weight and authority to assign to their testimony.

    F.  Counsel failed to locate or interview Terry Felhauser, who installed the deadbolt on 2222 Zabel Drive, Apt. C, and who had keys to the deceased's apartment.

(Resp. Ex. 8, ECF No. 10-1 at 117.)    Two of these six alleged errors, though in slightly different form, were initially raised by habeas counsel in Petitioner's Amended Habeas Petition as potential claims raised pursuant to *Losh v. McKenzie*, 277 S.E.2d 606 (W. Va. 1981).    (Resp. Ex. 12, ECF 10-2 at 60.)    These two potential claims, along with several others, were apparently abandoned during proceedings before the circuit court.    The record before the Court does not contain a full transcript of the state habeas hearings, but the Order adjudicating only some of Petitioner's claims on the merits, while noting that Petitioner was informed at the hearing of his obligation to bring all claims in one proceeding, leads the Court to conclude that Petitioner's counsel must have declined to pursue the *Losh* claims referenced in the amended petition. (Resp. Ex. 13, ECF 10-2 at 64–68.)    The other four errors (in the pro se habeas petition, grounds B, C, E, and F) do not appear to have been raised in the amended petition at all, and consequently were not adjudicated.

Petitioner claims that he was similarly prejudiced by his habeas counsel's failure to pursue his claim that his due process rights were violated when the trial court required defense witnesses to testify in prison garb. The merits of that claim were addressed previously in this Opinion.

present or later abandoning these claims during the collateral proceedings before the state habeas court.   He cites his habeas counsel's ineffective assistance as "cause" excusing his procedural default on these claims.[20]   Petitioner raised at least some of these underlying ineffective assistance of trial counsel claims in a prior § 2254 Petition filed May 17, 2013, though at that time he did not specifically plead facts to excuse the procedural default.   (*Samples v. Ballard*, No. 2:13-cv-11638, ECF No. 2.)   The Magistrate Judge's PF&R recommending the denial of his habeas petition for failure to exhaust state court remedies, however, referenced the *Martinez* standard explicitly and stated that that "[Petitioner] will have the opportunity to address the *Martinez* requirements in his new petition, should he choose to file one."[21]   *Samples v. Ballard*, No. 2:13-cv-11638, 2014 WL 1338562, *10 (S.D. W. Va. Jan. 21, 2014).   Curiously, Petitioner elected not to raise either the ineffective assistance of habeas counsel claim or the underlying errors of trial counsel in the § 2254 Petition now under review.

The Court declines to review habeas claims that should have been raised in the § 2254 Petition.   *United States v. Humphreys*, 194 F.3d 1306, *1 (4th Cir. 1999) (unpublished table disposition) (finding a district judge did not abuse its discretion when it refused to consider a claim raised for the first time in objections to the magistrate judge's recommendation).   In doing so, the Court acknowledges that the Fourth Circuit has not definitively resolved this question.   *See*

---

[20]  As explained by Magistrate Judge Tinsley in his PF&R in Petitioner's prior § 2254 case, these claims "are unexhausted and are considered to have been procedurally defaulted as a result of the petitioner's failure to pursue those grounds both in his amended habeas corpus petition filed in the Circuit Court of Kanawha County and in the appeal therefrom."   *Samples v. Ballard*, No. 2:13-cv-11638, 2014 WL 1338562, *10 (S.D. W. Va. Jan. 21, 2014).

[21]  This Petition was ultimately dismissed without prejudice after this Court, adopting the recommendation of the Magistrate Judge, found that Petitioner's claims were unexhausted due to his pending appeal before the West Virginia Supreme Court.   *Samples v. Ballard*, No. 2:13-cv-11638, 2014 WL 1342312, *8 (S.D. W. Va. Mar. 31, 2014.)

*United States v. George*, 971 F.2d 1113, 1118 (4th Cir. 1992).   In *George*, the United States objected to a magistrate judge's recommendation to suppress key evidence following an evidentiary hearing.   In doing so, the Government raised arguments in support of the evidence's admission that had not been presented to the magistrate judge—arguments that the district court declined to hear on that basis.   The Fourth Circuit reversed, reasoning: "We believe that as part of its obligation to determine *de novo* any issue to which proper objection is made, a district court is required to consider all arguments directed to that issue, regardless of whether they were raised before the magistrate."   *Id.*

In so finding, the Fourth Circuit did not express any intent to extend its holding to either habeas cases or to cases where the arguments raised in the objections went to an issue *not* before the magistrate judge.   The Court is skeptical that the Fourth Circuit would have intended such a result, particularly because its reasoning in *George* runs contrary to that of its sister circuits, which universally hold that a district court is not required, either because such review is discretionary or due to waiver, to entertain arguments not presented to the magistrate judge.[22]   The Court finds *George* non-controlling in a case, such as this, where a habeas petitioner uses his objections to plead new claims that should have been raised in the habeas petition.   Other district courts within

---

[22]   *See Williams v. McNeil*, 557 F.3d 1287, 1292 (11th Cir. 2009) (finding that requiring a district court to consider new arguments raised in objections would unfairly benefits litigants who change their tactics in response to an unfavorable recommendation from the magistrate); *Murr v. United States*, 200 F.3d 895, 902 n. 1 (6th Cir. 2000) (a party's failure to raise an argument before the magistrate judge constitutes waiver); *United States v. Howell*, 231 F.3d 615, 621 (9th Cir. 2000) (holding that "a district court has discretion but is not required, to consider evidence presented for the first time in a party's objection to a magistrate judge's recommendation"); *Freeman v. Cty. of Bexar*, 142 F.3d 848, 851–52 (5th Cir. 1998) (same); *Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996) (deeming waived issues raised for the first time in objections); *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 990–91 (1st Cir. 1988) ("We hold categorically that an unsuccessful party is not entitled as of right to de novo review by the judge of an argument never reasonably raised before the magistrate.").

the Fourth Circuit have distinguished *George* on this basis in habeas proceedings.[23]   *Scruggs v. Stevenson*, No. 5:12-cv-02940-RBH, 2014 WL 958280, at *2 (D.S.C. March 11, 2014) (distinguishing *George*; refusing to entertain claims that were not contained in the habeas petition; finding "[p]etitioner cannot now use his objections to plead new habeas claims"); *White v. Keller*, No. 1:10CV841, 2013 WL 791008, at *4 (M.D.N.C. March 4, 2013) (declining to hear the petitioner's objections because he sought to assert a new claim, not an argument with respect to an existing claim); *Salinas v. Cartilidge*, 4:07-4149-HFF-TER, 2009 WL 438006, at *1 (D.S.C. Feb. 20, 2009) (petitioner waived issues raised for the first time in objections to magistrate's recommendation).

Unlike in *George*, where the Government's objections raised new argument relating to an issue that had been properly presented to the magistrate judge, here Petitioner seeks to use his objections to assert an entirely novel habeas claim.   Permitting Petitioner to raise his *Martinez* claim at this point in the case would show disregard for AEDPA's timing requirements, defeat the purpose of the Magistrates Act, and unfairly prejudice the Respondent in this matter.   Petitioner raised the *Martinez* claim in objections filed eleven months after the filing of his § 2254 Petition. The Court finds it imprudent to extend *George*'s holding to a habeas case where the resulting effect would be to allow a habeas petitioner to elude AEDPA's filing deadlines by changing course after

---

[23]  Where district courts within this Circuit confronted the issue without citing *George*, they generally decline to hear new habeas claims.   *See Triplett v. Deboo*, No. 5:12cv140, 2014 WL 235521, at *3 (N.D. W. Va. Jan. 22, 2014) (refusing to entertain habeas arguments raised for the first time in objections to the magistrate judge's recommendation); *Kelley v. Bollinger*, C/A/ No. 8:12-cv-03008-JMC, 2013 WL 4460155, at *2 (D.S.C. Aug. 15, 2013) (declining to address a new ground upon which the petitioner sought habeas relief where raised for the first time in the petitioner's objections to the magistrate's report); *Collins v. United States*, No. 1:06-0490, 2009 WL 3186792, at *4 (S.D. W. Va. Sept. 30, 2009) (issues raised for the first time in objections are deemed waived); *Jones v. United States*, 1:06cv18, 2008 WL 4643909, at *6 (N.D. W. Va. Oct. 20, 2008) (same).

receiving an unfavorable ruling from the magistrate judge.[24]   *See* 28 U.S.C. § 2244(d)(1).   The Court therefore **DECLINES** to entertain Petitioner's argument that the ineffective assistance of counsel at the state collateral proceedings established "cause" for procedural default on his ineffective assistance of trial counsel claims.   However, because the Court finds its procedural ruling debatable, at least without further clarification of the limits of *George*, it will grant a certificate of appealability on this issue.

### III. CONCLUSION

Accordingly, the Court **OVERRULES** Petitioner's objections (ECF No. 29), **ADOPTS** the PF&R (ECF No. 25), **GRANTS** Respondent's motion for summary judgment (ECF No. 10), **DENIES** Petitioner's motion for partial summary judgment (ECF No. 19), **DISMISSES** this case, and **DIRECTS** the Clerk to remove this case from the Court's docket.

The Court has also considered whether to grant a certificate of appealability.   *See* 28 U.S.C. § 2253(c).   A certificate will be granted only if there is "a substantial showing of the denial of a constitutional right."   *Id.* at § 2253(c)(2).   The standard is satisfied only upon a showing that reasonable jurists would find that any assessment of the constitutional claims by this Court is debatable or wrong and that any dispositive procedural ruling is likewise debatable.   *Miller–El v. Cockrell*, 537 U.S. 322, 336−38 (2003); *Slack v. McDaniel*, 529 U.S. 437, 484 (2000); *Rose v. Lee*, 252 F.3d 676, 683−83 (4th Cir. 2001).   The Court **GRANTS** a certificate of appealability limited to the procedural issue of whether Petitioner's claims should be heard where they were raised for

---

[24]  This holding is only strengthened by the fact that Petitioner was explicitly notified of the need to raise these claims in a timely manner following the exhaustion of his state court remedies.   *Samples v. Ballard*, No. 2:13-cv-11638, 2014 WL 1338562, *15 (S.D. W. Va. Jan. 21, 2014) (informing Petitioner that he had "54 days remaining under the one-year statute of limitations, which is presently tolled by the petitioner's pending state habeas appeal.").)

the first time in objections to the Magistrate Judge's PF&R.   As to the other claims raised in Petitioner's § 2254 Petition and objections to the PF&R, the Court finds that Petitioner has not made a substantial showing of the denial of a constitutional right and otherwise **DENIES** a certificate of appealability.   Pursuant to Rule 11(a) of the Rules Governing Proceedings Under 28 U.S.C. § 2254, Petitioner may not appeal the Court's denial of a certificate of appealability, but he may seek a certificate from the court of appeals under Federal Rule of Appellate Procedure 22.

        **IT IS SO ORDERED**.

        The Court **DIRECTS** the Clerk to send a copy of this Order to counsel of record and any unrepresented party.

                    ENTER:      March 31, 2016

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE